NORTH AMERICAN PAPER COMPANY, Plaintiff and Counterdefendant-Appellant, v. SELWYN UNTERBERGER, Defendant and Counterplaintiff-Appellee.

First District (3rd Division)   No. 1—86—2364

Opinion filed July 6, 1988.

Lewis B. Greenblatt, Richard Lee Stavins, and Joanne F. Hurley, all of Chicago, for appellant.

Arvey, Hodes, Costello & Burman, of Chicago (Fred R. Kimmel, of counsel), for appellee.

JUSTICE RIZZI delivered the opinion of the court:

Plaintiff, North American Paper Company (NAPCO), brought this action against its former employee, Selwyn Unterberger, to obtain an injunction and damages based upon a covenant (Agreement) not to compete or disclose information obtained during Unterberger's employment. Unterberger filed a counterclaim seeking a declaratory judgment that the Agreement was void. The trial court found that the Agreement is invalid and unenforceable, and entered summary judgment in favor of Unterberger. NAPCO appeals. We affirm.

NAPCO is engaged in the business of distributing and selling disposable paper and plastic goods, material handling equipment, printing and business forms, packaging products, disposable food service items, and chemical and janitorial maintenance supplies. The chemical and janitorial items that it sells are basic cleaning, maintenance, sanitizing and floor care products, commonly called chemical products. NAPCO does business in all 50 States of the United States.

Unterberger was employed continuously by NAPCO from May 1, 1979, until May 31, 1986, as the manager of NAPCO's chemical maintenance products and janitorial division, one of NAPCO's five divisions. Prior to working for NAPCO, Unterberger had been employed for 10 years by Jefco Laboratories, selling and supervising the sale of the same kinds of items, chemical products, that he was later hired by NAPCO to sell. Before he accepted employment with NAPCO, Unterberger disclosed that his agreement with Jefco prohib-

ited him from soliciting Jefco customers, and he provided NAPCO with a copy of the agreement. After NAPCO contacted Jefco, NAPCO determined that it could hire Unterberger without violating the Jefco agreement.

Unterberger was hired by NAPCO to establish a new chemical division, to teach salesmen in other divisions of NAPCO to sell chemical products, and to teach NAPCO how to compete in the chemical products industry. When NAPCO hired Unterberger, it had only a few customers for its chemical products and virtually no confidential information relating to chemical products. Under Unterberger's direction, the yearly sales for NAPCO's chemical products increased over a period of about seven years from $50,000 to a projected $1.8 million for 1986.

Unterberger resigned from NAPCO effective May 31, 1986, and has been an employee of Interstate Paper Company, a competitor of NAPCO, since June 2, 1986. Interstate is located in Melrose Park, Illinois. NAPCO admits that Unterberger has not solicited business from any of NAPCO's customers; NAPCO has lost no customers or suppliers because of Unterberger; none of NAPCO's customers has ceased doing business with NAPCO because of Unterberger; NAPCO has suffered no monetary loss as a result of Unterberger's conduct; and Unterberger has not used or divulged any confidential information obtained from NAPCO. Also, NAPCO does not contend that Unterberger took customer lists, or any other property belonging to NAPCO. Unterberger's customer list was taken from him by NAPCO before he left NAPCO and "no one could hope to memorize the rather extensive list." In addition, according to NAPCO, although it is one of the largest distributors of its product line within a 200-mile radius of downtown Chicago, except for its few national accounts, NAPCO "cannot effectively compete beyond a 200-mile radius from its Chicago area offices."

When NAPCO hired Unterberger in 1979, Unterberger was required to sign the Agreement as a condition of employment. The Agreement, which was prepared by NAPCO, imposes no duties on NAPCO. Unterberger was hired as an employee at will, and he could have been terminated at any time after executing the Agreement, without notice or cause.

The Agreement reads, in part, as follows:

> "Employee covenants, warrants and agrees that at no time during his employment with the Company, and during a period of two (2) years from the date of severance of his employment with the Company, without regard to the cause of such sever-

ance of employment, shall Employee become an employee, agent, officer, director, proprietor, partner, shareholder, consultant, advisor, or other affiliate of any organization, person, partnership, corporation, trade, business or entity which is engaged in or becomes engaged in competition, whether direct or indirect, with the Company, for a radius of 200 miles from the Company's office located at 330 South Wells Street, Chicago, Illinois, and also any other geographical area covered by the business activities of the Company in which Employee has rendered services directly or indirectly to the Company at any time."

As is apparent, the Agreement contains a 400-mile circular area (with downtown Chicago at the hub) as a specific noncompetition zone. Within this noncompetition zone, Unterberger is prohibited from associating with any competitor in any capacity whatsoever, even if Unterberger's job were merely menial and he had absolutely nothing to do with sales or purchasing. In addition to the specific noncompetition zone, the Agreement contains a nonspecific noncompetition zone encompassing any other geographical area covered by the business activities of NAPCO in which Unterberger rendered services directly or indirectly to NAPCO at any time.

John Miller, NAPCO's executive vice-president, testified that the specific and nonspecific noncompetition zones in the Agreement would cover about one-third of the United States and numerous major cities. Miller testified that the Agreement would also preclude Unterberger from working in any capacity in any geographical area where the chemical division of NAPCO did business even for a supplier who supplies chemical products to a competitor, since that would be indirect competition. Miller could not specify the precise geographical areas that would have been encompassed by the nonspecific noncompetition zone since NAPCO does business in all 50 States and he did not know all of the places where Unterberger had rendered services directly or indirectly to NAPCO at any time.

Unterberger did little or no business for NAPCO in several major metropolitan areas covered by the Agreement's specific noncompetition zone. Miller could not recall a single customer Unterberger regularly did business with in Milwaukee, Wisconsin. He stated that Unterberger did no business for NAPCO in the following cities: Green Bay and Kenosha, Wisconsin; Dubuque, Iowa; Grand Rapids, Michigan; Gary, Fort Wayne, Hammond and South Bend, Indiana; Aurora, Champaign, Peoria, Springfield and Urbana, Illinois. Miller also stated that Unterberger did only occasional business (one cus-

tomer) for NAPCO in Madison, Wisconsin, and Davenport, Iowa; occasional business for NAPCO in Indianapolis, Indiana; and occasional business (two customers) in Elgin and Rockford, Illinois. All of these cities are within the specific noncompetition zone.

In the cities encompassing the specific noncompetition zone of the Agreement, NAPCO had between 1 and 11 customers in a few cities in Indiana; between one and five customers in a few cities in Michigan; between 1 and 10 customers in a small number of cities in Wisconsin; between one and six customers in only five Iowa cities; a total of three customers in Ohio; and in numerous towns and cities in Illinois it had only small numbers of customers. NAPCO does not claim to do any business in numerous cities encompassed by the specific noncompetition zone in the Agreement. Also, NAPCO does no business with nor does it attempt to sell any products to restaurants, fast-food establishments, small retail businesses, residential buildings, public institutions, State or Federal governments, airports, boating and marine stores or bus terminals. Miller testified that NAPCO would not suffer any monetary damage if Unterberger sold chemical products to such customers.

■■ ■ In reviewing this case, we are immediately faced with the principle that employers are entitled to ensure their legitimate protectible interests by making the execution of a restrictive agreement a condition of employment. However, we agree with the trial court that as a matter of law the employment restrictions contained in the Agreement in this case are so overly broad, unreasonable and burdensome that they far exceed any legitimate protectible interest that NAPCO may have had in preparing and having the Agreement executed. Moreover, the Agreement renders Unterberger virtually unemployable in his field of occupation as well as other related fields. Employment agreements which restrict an employee's ability to earn a living in his field of occupation throughout an unreasonable geographical area are against public policy and unenforceable. *Aristocrat Window Co. v. Randell* (1965), 56 Ill. App. 2d 413, 427, 206 N.E.2d 545, 552.

NAPCO also seeks to enforce the nondisclosure aspect of the Agreement. In this regard, the Agreement provides:

> "The Employee agrees that neither he, nor any individual, partnership, corporation, organization or entity under his influence or control, directly or indirectly, will at any time, during and after the date of his employment with the Company, disclose, convey, transmit, or make known or available to any individual, partnership, corporation, organization or entity ex-

cept within the ordinary, necessary and proper scope of Employee's employment, any information regarding manufacturing, purchasing, research, development methods, practices, accounting, suppliers, marketing, merchandising, customers of the Company, distribution, sale or use of any and all disinfectants, special chemical products or formulae, water treatment products or methods, degreasing, sanitary and maintenance techniques, systems, products or procedures, floor care and maintenance and the equipment therefor, paper products, including, but not limited to sanitary and disposable paper products, and any and all related items, and any and all items of whatever nature or kind which the Employee has learned of, acquired or obtained knowledge of, conceived, developed, originated, discovered, invented or otherwise become aware of during the period of his employment, provided that this paragraph shall not apply to information within the public domain and generally known within the paper and packaging industry."

It is undisputed that NAPCO had virtually no confidential methods or systems relating to chemical products when the Agreement was signed, and Miller testified that NAPCO had no evidence that Unterberger has ever used or divulged any confidential information obtained from NAPCO. However, NAPCO claims that it had protectible confidential information at the time Unterberger left NAPCO. We have reviewed this case on the presumed basis that NAPCO's claim is factually true.

It is uncontested that NAPCO's competitors could develop all of the information that NAPCO contends is confidential. The record demonstrates that chemical product prices are changed periodically for each product to meet competitive situations with each customer and as the markets change. Some prices change frequently and, according to Miller, the number of prices charged for different chemical products to different customers is so large as to be exponential. Miller stated that no pricing information would be accurate for even as short a period as two years.

■ ■ Since employment nondisclosure agreements affect a State interest, that is, the free flow of information necessary for commercial competition, they are enforceable only if their chronological and geographical limitations are reasonable, the information which they seek to protect is in fact confidential, and their restrictions are reasonably necessary for the protection of a legitimate proprietary interest. (*Cincinnati Tool Steel Co. v. Breed* (1985), 136 Ill. App. 3d 267, 275-76, 482 N.E.2d 170, 175.) Here, the nondisclosure aspect of the

Agreement has no chronological or geographical limitations of any kind, it purports to protect virtually every kind of information that Unterberger learned during the period of his employment even if nonconfidential and it goes far beyond any possible legitimate protectible interest of NAPCO. Thus, we agree with the trial court's sound conclusion that the nondisclosure aspect of the Agreement constitutes an impermissible restraint of trade and is void as a matter of law.

Next, NAPCO argues that the grant of summary judgment was erroneous because the trial court should have considered a modification of the Agreement if it was too broad. We disagree.

■ While a trial court may employ equity principles and modify the restraints embodied in any employment agreement and enforce the restraints as modified, the fairness of the restraints imposed in the written agreement is a relevant consideration to the application of such equity principles. (*House of Vision v. Hiyane* (1967), 37 Ill. 2d 32, 39, 225 N.E.2d 21, 25.[1]) Here, there is no fairness apparent in the Agreement that NAPCO compelled Unterberger to sign as a condition of employment. Rather, the Agreement is redolent of the historical past when involuntary servitude was an accepted practice.

Accordingly, we agree with the trial court that the Agreement is "unconscionable, unreasonable, overbroad in its application and scope, and constitutes an unlawful restraint of trade insofar as it would restrict" Unterberger's employment. The judgment is affirmed.

Affirmed.

McNAMARA and FREEMAN, JJ., concur.

---

[1]See a scholarly presentation on the subject of fairness and reasonableness in covenants not to compete in Scotillo & Rose, *Restrictive Covenants Not-to-Compete*, in Chancery & Special Remedies 13-27 (Ill. Inst. for Cont. Legal Educ. 1982).