**TELXON CORPORATION, Plaintiff,**

v.

**Steven H. HOFFMAN, Defendant.**

No. 89 C 3176.

United States District Court,
N.D. Illinois, E.D.

Aug. 22, 1989.

**658**

David S. Acker, Winston & Strawn, Chicago, Ill., and Robert A. Goodman and Thomas J. Hildebrandt, Goodman, Weiss, Freedman, Cleveland, Ohio, for plaintiff.

Ronald B. Coolley and Stephen G. Rudisill, Arnold, White & Durkee, Chicago, Ill., for defendant.

## MEMORANDUM AND ORDER

MORAN, District Judge.

This action arises from an employment agreement executed between plaintiff Telxon Corporation (Telxon) and defendant Steven H. Hoffman (Hoffman). Hoffman left Telxon on March 24, 1989 and is now employed by Symbol Technologies, Inc. (Symbol). Telxon brought suit for, *inter alia,* injunctive relief to enforce Hoffman's contractual obligation not to compete against Telxon and not to use or disclose information therefrom. We referred the case to a magistrate, who proposed various findings of fact and law, and recommended issuance of the requested preliminary injunction. Having reviewed each party's comments to the magistrate's report, our *de novo* assessment [1] compels us to deny the request for injunctive relief.

### FACTS

Telxon is a Delaware corporation whose products are sold throughout the United States and in foreign countries. It designs, markets and services application-specific computer systems using portable, battery-powered computers which it manufactures in hand-held, vehicle-mounted and lap-top styles. These products are offered as portable teletransaction computers or "PTC's." The entire system consists of PTC hardware, application software, peripheral equipment, communications devices and integrative software. The latter enables a

---

**1.** 28 U.S.C. § 636(b)(1)(A) explicitly exempts from review under the "clearly erroneous or contrary to law" standard determinations pertaining to the propriety of injunctive relief. We asked the magistrate to conduct hearings and to submit to us proposed findings of fact and recommendations for disposition. 28 U.S.C. § 636(b)(1)(B). As such, we review both the magistrate's factual and legal recommendations anew. 28 U.S.C. § 636(b) ("A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.")

Telxon PTC system to communicate with a user's personal computer or host system. Customer personnel often use Telxon systems to tour store aisles, review current inventory and record product codes and quantities. That information is subsequently transmitted by telephone to central customer computers.

Telxon has developed considerable expertise in designing these systems and competes with five major competitors in this market: Symbol/MSI, LXE, Norand, Intermex, and Panasonic.[2] The Telxon systems organization ascertains a particular customer's needs, writes the software necessary for the application and works with the customer to ensure smooth operation.[3] This type of product has been used in both the wholesale and retail business, and predominantly in the grocery, drug and hardware industries. Nonetheless, Telxon has tried to move beyond these traditional markets and services by designing supplemental systems for present users, augmenting their existing systems with new applications and products.

The question of customer loyalty has been contested before both the magistrate and this court. We find both the magistrate's and the parties' interpretations compatible. The magistrate concluded that Telxon's customer relationships are long-lasting, that Telxon systems personnel ensure the proper working of the systems through service and maintenance, and that an appreciable portion of Telxon's business is done with existing customers, who are assisted in exploring new products and applications. Hoffman only partially disagrees, contending large numbers of customers seek the lowest price without regard to company loyalty, and therefore frequently change suppliers, depending on price.[4]

Given the highly competitive nature of the industry, it is not surprising that Telxon expends significant resources identifying potential customers, exploring their needs, locating the proper decisionmakers and educating them about the value of PTC systems. While certain customers identify themselves as such by giving testimonials, and while certain others are known to be using Telxon products, Telxon guards the information it acquires and develops in cultivating customers and servicing their needs.

Various Telxon subsidiaries also operate in the computer field. Real–Time Computer Specialists (Real Time) sells packaged PTC application and communication software. And Information Management Group offers software for both integrated retail store management and also corporate level accounting.

Defendant Hoffman became employed by Telxon on July 17, 1986. His initial position there was systems analyst and he later became the district systems manager responsible for customers in Illinois and Wisconsin. Prior to his employment at Telxon, Hoffman was employed for six years in the broader computer industry.

On his first day of work, Telxon presented Hoffman with a packet of materials for him to execute. Only then did Hoffman become aware of Telxon's policy of having each and every employee sign the same Employment Agreement. That document provides both restrictions on the signor's post-Telxon employment and also limits disclosure of various information. In relevant part, the employment restrictions are as follows:

---

**2.** Since our conclusion does not depend on whether Telxon competes with five or six others, we need not resolve whether the magistrate incorrectly omitted Hand–Held Products, Inc. from his list.

**3.** This is not to say, however, that the customized solution each customer receives could not have been provided by firms other than Telxon. Other companies, including Symbol, employ the systems approach. The point is merely that customers receive both software and hardware particularly suited to their needs. That claim co-exists quite well with Hoffman's allegation that Telxon merely provides a "solution that could be provided by any number of companies in the industry" (tr. 491–93) (def.obj. at 40).

**4.** This opinion does not depend on further evaluation of the remaining tension between the parties' positions. After additional discovery, that determination will be made considerably easier.

I further agree that during the term of my employment and for a period of one year thereafter (and, as to clause (iii) below, at any time after the term of my employment) I will not, directly or indirectly, do or suffer any of the following:

(i) Own, manage, control or participate in the ownership, management or control of, or be employed or engaged by or otherwise with, any other corporation, partnership, proprietorship, firm association, or other business entity, or otherwise engage in business, which is engaged in any manner in, or otherwise competes with, the business of the COMPANY (as conducted on the date I cease to be employed by the COMPANY in any capacity, including as consultant); provided, however, that the ownership of not more than 1% of the stock of any publicly traded corporation shall not be deemed a violation of this covenant; or

(ii) Employ, assist in employing, or otherwise associate in business with any present, former or future employee, officer or agent of the COMPANY or any of the COMPANY's affiliates or subsidiaries; or

(iii) Induce any person who is an employee, officer or agent of the COMPANY or any of the COMPANY's affiliates or subsidiaries to terminate said relationship.

The disclosure-of-information restrictions immediately precede the above:

I further agree to treat as confidential all COMPANY know-how, trade secrets and/or confidential information (including, without limitation, information concerning inventions, proposed products, sales volume, sales procedures, customers, quality control, production, sales and other costs, plans, methods, experiments, and use of materials, equipment and machinery) pertaining to the COMPANY's business, or obtained while in the employ of the COMPANY (including without limitation that which may be obtained by me from specifications, drawings, blueprints, processes, formulae, reproductions, models and other sources), and I further agree that without the written approval of the COMPANY I will not publish or disclose the same to others or use the same for my own account, either during the term of my employment or after termination (with or without cause) of such employment.

The record lacks other material respecting additional circumstances surrounding the execution of the employment agreement.

As a systems analyst, Hoffman worked on specifically-assigned customer accounts and also on developing proposals for prospects. He coordinated efforts with Telxon's sales force to ascertain the needs of both customers and prospects, and worked to design an appropriate Telxon system. The magistrate recommends finding that "by virtue of his position, he [Hoffman] established and maintained with each assigned customer a close relationship that continued well after the application was in place" (prop. finding of fact # 25), though the parties dispute the number of these assignments to which Hoffman personally attended. As a district systems manager, Hoffman continued to develop systems solutions for the company's customers and prospects, and also supervised the systems analysts in his group.

The crucial factual questions concern the degree to which these responsibilities brought Hoffman an uncommon familiarity with the needs of Telxon's customers and prospects. The magistrate proposed factual findings respecting Hoffman's "position and hands-on style of management" (prop. factual finding # 27), and concluded that

[a]s a result of these activities, defendant [Hoffman] was familiar with the needs, applications, and system solutions of all Telxon customers and prospects handled by the district sales and systems forces, especially the most crucial ones. (Tr. 310–314) He maintained and reviewed reports of all accounts and projects handled by his systems group, which he updated weekly. (Tr. 319–320) Defendant was uniquely positioned to know about Telxon's system solutions. He understood the market for the portable telecomputing devices sold by Telxon and the strategies that Telxon employed and

planned to employ to penetrate and expand that market for its products. (Prop. finding of fact # 26.) We agree with these findings, though we question below the degree to which the magistrate finds them dispositive.

On March 24, 1989, Hoffman resigned from Telxon. He subsequently began working as a regional systems manager for Symbol in a region covering both Illinois and Wisconsin. The duties of this position mirror those of Hoffman's former job at Telxon and have him supervising those who design Symbol systems solutions. Fear of litigation prompted Symbol to promise contractually to indemnify Hoffman for any losses incurred from his potentially violating his Telxon employment agreement.

## DISCUSSION

### I. *Appropriate Legal Standard*

We have often evaluated requests for preliminary relief and have done so within the framework established here in the Seventh Circuit. Judge Posner's seminal opinion in *Roland Machinery Co. v. Dresser Industries*, 749 F.2d 380 (7th Cir.1984), articulated the relevant standards to be applied. That opinion recognized the same considerations prevalent in other judicial formulations, namely, that the plaintiff must show:

(1) A strong likelihood of success on the merits;

(2) A substantial threat of irreparable injury;

(3) That the threatened injury outweighs the harm issuance would cause the defendant; and

(4) That the granting of the injunction would not disserve the public interest.

But Judge Posner went further and adopted a "sliding scale" approach to those purportedly independent demonstrations. Respecting the likelihood of success on the merits, and that the balance of harm favors issuance, for example, the court noted:

(5) If the plaintiff does show some likelihood of success, the court must then determine how likely that success is, because this affects the balance of relative harms (point 3 above). The more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor, the less likely he is to win, the more need it weigh in his favor. This is a most important principle, and one well supported by cases in this and other circuits, and by scholarly commentary.

*Id.* at 387 (citations omitted). This court has wholeheartedly embraced the "sliding scale" approach, most recently in *Dobson, et al. v. Chicago and Northeast Illinois District, United Brotherhood of Carpenters, et al.*, 707 F.Supp. 348 (N.D.Ill.1989), and we apply that analysis here.

*Roland Machinery* does not overrule the line of Illinois cases holding that "to establish a probability of success on the merits, the petitioner need raise only a fair question as to the existence of the right claimed and that he will probably be entitled to injunctive relief if he proves his allegations." *A.B. Dick Co. v. American Pro-Tech*, 159 Ill.App.3d 786, 791, 514 N.E.2d 45, 48, 112 Ill.Dec. 649, 652 (1st Dist.1987). With a significant balance of harm favoring relief, injunctions will issue with merely "a fair question as to the existence of the right claimed." *Id. Roland Machinery* merely restates the obvious—that the "fair question" determination is not dispositive—and elucidates the circumstances under which varying probabilities of success suffice.

Other Illinois cases appear to define "fair question" in the particular circumstances where employment contracts protect certain information or secure non-competition. With respect to the former, plaintiffs can protect confidential and/or proprietary information, and non-competition agreements can protect near-permanent customer relationships. *See, e.g., McRand, Inc. v. Van Beelen*, 138 Ill.App.3d 1045, 1051, 486 N.E.2d 1306, 1311, 93 Ill.Dec. 471, 476 (1st Dist.1985). We review the relevant indicia and apply them to these facts *infra*.

### II. *Probability of Success on the Merits*

#### A. Enforceability of the Entire Contract

■ We quickly dismiss Hoffman's contention that industry custom somehow im-

pacts on whether the entire employment agreement at issue is reasonable. That Telxon's competitors choose not to protect their legitimate interests by contract does not impact on Telxon's ability to do so. Different companies have different needs and Telxon's own determination is apparent. It is not bound by any industry custom.

■ We do of course scrutinize the particular employment agreement at issue, but prior to considering the intricacies of that document we evaluate the manner by which Hoffman allegedly came to be bound by it. He contends those circumstances render the employment agreement an unenforceable contract of adhesion.

The magistrate's report does not specifically mention this dispute. If anything, factual finding # 20—*"Like all other Telxon employees,* defendant executed an Employment Agreement upon starting his employment with Telxon"—seems to buttress Hoffman's contention. Each and every Telxon employee, without regard to his or her position at the firm, signed the same agreement. That sort of broad-based application—without respect to the individual's particular responsibilities or stature—typifies the problem:

> "Adhesion contracts" include all "form contracts" submitted by one party on the basis of this or nothing. Ehrenzweig [Ehrenzweig, "Adhesion Contracts in the Conflict of Laws," 53 Col.L.Rev. 1073 (1953)] defines them as "agreements in which one party's participation consists in his mere 'adherence,' unwilling and often unknowing, to a document drafted unilaterally and insisted upon by what is usually a powerful enterprise."

Corbin on Contracts, § 1446. It is also true that the court's consideration of the various factors surrounding the contract's negotiation begin only after the aforementioned determination:

> Finding that there is an adhesion contract is the beginning point for analysis, not the end of it; what courts aim at doing is distinguishing good adhesion contracts which should be enforced from bad adhesion contracts which should not.

*Id.* at § 559A–591 (Kaufman Supp.1980).

Neither side disputes that the presence of various factors can render certain covenants not to compete *unenforceable* contracts of adhesion. The operative inquiry concerns whether there is "overreaching by a contracting party in an unfairly superior bargaining position." *American Food Management, Inc. v. Henson,* 105 Ill. App.3d 141, 146, 434 N.E.2d 59, 63, 61 Ill.Dec. 122, 126 (5th Dist.1982). Here Telxon does not dispute that Hoffman (1) was not informed that he would need to sign an employment agreement prior to accepting the position, (2) received that agreement in a package containing various other forms, (3) was presented with the form on his first day of work, and (4) received no explanation as to the limitations codified by the agreement (tr. 535). In circumstances remarkably similar to these, the *Henson* court determined the contract there at issue to be unconscionable:

> Plaintiff's conduct in failing, whether intentionally or unintentionally, to give reasonable notice that agreement to a covenant not to compete would be a condition of employment before defendant ... had relocated and begun working for plaintiff amounted to overreaching by a contracting party in an unfairly superior bargaining position.

*Id.* Additional boilerplate language in the agreement itself purportedly demonstrating the signor's comprehension[5] cannot

---

5. The Employment Agreement contains the following passage:

> I have carefully considered the nature and extent of the restrictions upon me and the rights and remedies conferred upon the COMPANY under this Agreement, and hereby acknowledge and agree that the same are reasonable in time and territory, are designed to eliminate competition which otherwise would be unfair to the COMPANY, do not stifle my inherent skill and experience, would not operate as a bar to my sole means of support, are fully required to protect the legitimate interests of the COMPANY and do not confer a benefit upon the COMPANY disproportionate to detriment of me.

remedy the imbalance of bargaining power, and are instead evidence of it. We therefore apply the Illinois law at issue and predict that a full trial on the merits would likely conclude that the employment agreement was an unenforceable contract of adhesion.

*Eisele v. Ayers*, 63 Ill.App.3d 1039, 381 N.E.2d 21, 21 Ill.Dec. 86 (1st Dist.1978) is not to the contrary. The issue there concerned whether second and third-year medical students could challenge a tuition increase by contending its assessment imposed a contract of adhesion. The *Eisele* court held that the defendants had not taken unfair advantage of the plaintiffs because "the tuition increase was a financial necessity" and because "the university will make funds available to those persons unable to bear the additional expense." 63 Ill.App.3d at 1046, 381 N.E.2d at 27, 21 Ill.Dec. at 92. We discuss whether the entire employment agreement was a "necessity" below. More importantly, Telxon makes no effort to cushion the consequences of its contract, as did the school in *Eisele*. Conceivably, Telxon could assist its employees whose future employment prospects became limited by the agreement by helping them find jobs which would not run afoul of it. Not surprisingly, the record reveals no such effort and we are, frankly, skeptical that such assistance would render an otherwise unenforceable agreement valid. In any event, *Eisele* does not augur for reconsideration of our prediction.

### B. Breadth of the Employment Agreement

Our evaluation under Illinois law concerns whether the agreement violates the state's equivalent of the federal antitrust rule of reason. The former rule in Illinois

was that the lack of a geographic limitation in a covenant not to compete rendered the covenant unenforceable *per se. See, e.g., Parish v. Schwartz*, 344 Ill. 563, 176 N.E. 757 (1931); *Hursen v. Gavin*, 162 Ill. 377, 44 N.E. 735 (1896). But we have long since recognized that exceptions to the general rule have developed to such a degree that the *"per se* rule has largely given way to rule of reason." *Samuel Bingham Co. v. Maron*, 651 F.Supp. 102, 105 (N.D.Ill.1986). As such, activity restrictions reasonably related to the former employer's interest in protecting its customer relations, typically restrictions against the solicitation of certain customers or using customer lists, do not necessarily require geographic limitations.

Telxon's memoranda suggest that the ballgame is therefore over, the rule of reason effectively squelching the entire dispute. Here, however, the employment agreement appears far from the sort of effort the rule of reason effectively protects. Instead, we evaluate whether this employment agreement qualifies for the protection afforded by the rule of reason.

### 1. *The Non–Competition Clause*

This controversy arises because both Telxon and the magistrate fear that Hoffman will give Symbol an unfair advantage in the competition for customers by using the knowledge of Telxon's products he received while working there. We therefore evaluate the degree to which the time, territory and activity restrictions on Hoffman's post-Telxon employment satisfy the rule of reason.

■ The agreement appears reasonable with respect to time. It specifies "the term of my employment and for a period of one year thereafter."[6] Accordingly, we agree

---

Put succinctly, the superior bargaining position apparent from the text discounts the probative force of this textbook recitation to zero.

Furthermore, a layman's opinion, even one as interested as Hoffman, cannot obviate our own legal analysis as to whether the agreement is "reasonable in time and territory," eliminates only "unfair competition," stifles the signor's "skill and experience," is "fully required to protect the legitimate interests of the company,"

and the like. Those determinations are textually made by us and us only.

**6.** In reality, the non-competition portion does contemplate slightly more. The term of subsection (iii)—prohibiting the inducement of "any person who is an employee, officer or agent of the COMPANY or any of the COMPANY's affiliates or subsidiaries to terminate said relationship"—apparently extends for longer: "as to clause (iii) below, at any time after the term of

that "[t]he time limitation of one year is reasonable" (pro. conclusions of law #7) and that the rule of reason protects the restriction on time.

■ The territorial limits—if they can be so called—present a considerably more complicated question. The agreement lacks any geographic limitation because, as the magistrate puts it, none "is reasonably possible, because Telxon competes worldwide" (pro. conclusions of law #7). But that misses the point. The inquiry concerns not where Telxon does business but, rather, where Hoffman's employment might risk Telxon's legitimate interests. The record reveals quite clearly that worldwide protection is unnecessary. Telxon's vice-president, Mr. Evans, testified:

Q. Okay. Would you—would you look at the entire agreement, Mr. Evans, and tell me if you are aware of any geographical restriction in there that would affect the non-compete clause?

A. The only time I have been involved in a situation like we are having right now, it was enforced only in local geographic areas. I don't think its worldwide.

It might not specifically say—you know, but if Steve wanted to go to work in Bangkok, Thailand, and sell handhelds, I doubt that I would stand in his way.

Q. How about in California?

A. I would be concerned in California. I would be concerned anywhere in the United States.

Q. But not Canada?

A. Right. I guess I would be all right with Canada.

Q. And Mexico?

A. He could sell all he wants in Mexico.

(Tr. 110–111). Accordingly, persuasive authority suggests that a more reasonably drawn geographic limitation was easily ascertainable and should therefore have been inserted.

In such circumstances, the territorial and activity scope questions often merge into a single inquiry because activity restrictions sometimes can save what otherwise would be considered unreasonable geographic restrictions.

In the cases approving unlimited geographic restrictions, the covenant not to compete at issue applied only to limited activities. That is, former employees were not prohibited from working for their former employers' competitors in any capacity; they were only prohibited from engaging in certain activities such as soliciting customers of their former employers with whom they had developed relationships, or using their former employers' confidential information.

*Samuel Bingham Co.*, 651 F.Supp. at 105.

Here, however, the agreement does nothing to define the activities covered thereby. We again invoke the relevant portions:

I will not, directly or indirectly, do or suffer any of the following:

(i) Own, manage, control or participate in the ownership, management or control of, or be employed or engaged by or otherwise affiliated or associated as a consultant, independent contractor or otherwise with, any other corporation, partnership, proprietorship, firm association, or other business entity, or otherwise engage in business, *which is engaged in any manner in, or otherwise competes with, the business of the COMPANY* (as conducted on the date I cease to be employed by the COMPANY in any capacity, including as consultant); ...

(ii) Employ, assist in employing, or otherwise associate in business with any present, future employee, officer or agent of the COMPANY or any of the COMPANY's affiliates or subsidiaries....

(Exh. 2 to def. obj. (emphasis added).) Even worse, the agreement uses the term "company" to refer collectively to Telxon Corporation and its subsidiaries. Restrictions as to activity are notoriously absent. Put another way, the relevant clauses do not preclude employment only in those capacities which might threaten Telxon's legitimate interests. As written, the agree-

my employment." We need not reach the reasonableness of that clause, however, as our

opinion predicts other issues will likely result in failure on the merits.

ment would prevent Hoffman from working as a competitor's janitor.[7]

Accordingly, we predict those restrictions would be held unreasonable under Illinois law. The leading case, *Dryvit Systems, Inc. v. Rushing*, 132 Ill.App.3d 9, 477 N.E.2d 35, 87 Ill.Dec. 434 (1st Dist.1985), held a considerably narrower activities limitation unreasonable:

> [T]he unlimited geographic restraints on competitive activities and solicitation of business and the further restriction from association with a corporation whose activities are competitive in the continental United States are patently beyond the needs of the employer to protect his interest and are unduly harsh on the employee.

132 Ill.App.3d at 12–13, 477 N.E.2d at 38, 87 Ill.Dec. at 437. That statement applies with even greater force to Telxon's covenant which prevents Hoffman from working for any competitor, in any capacity, anywhere.

Since a reading of the agreement reveals no activity limitations, the question here concerns whether any can be implied. We quote the relevant portion of the magistrate's report:

> Enforcement of the provision, however, prevents any employment of defendant in the narrow hand-held PTC computer industry, and leaves open to defendant employment in the broad general computer industry, in which defendant has substantial knowledge and experience. Thus, there are inherent activity restrictions in the Agreement.

(Pro. conclusions of law # 7.) At a different point in his report, the magistrate notes that "[t]he practical application of the noncompete clause is limited to these few corporations known to Telxon's employees"

(pro. conclusions of fact # 9). We do not think it can be read so narrowly.

First, we look beyond the four corners of the document only where uncertainties exist. As Judge Williams recently noted:

> Hairline also wants to use extrinsic evidence to show the limits of the geographic scope of the covenant. But Hairline has not pointed to any ambiguities in the covenant. Indeed, the agreement in this case is not more ambiguous on its face than was the agreement in *Dryvit*. Therefore, that court's resolution of the issue is dispositive here.

*Hairline Creations, Inc. v. Jerry Casper, Inc.*, No. 83 C 8385, slip op. at 11, 1986 WL 11626 (N.D.Ill.1986). We cannot locate any uncertainty respecting employment capacities prohibited in the agreement.[8] Ascertaining those corporations "known to Telxon's employees," is not the type of review to which courts are particularly well suited, and we avoid that inquiry where the agreement lacks ambiguity. Second, authors of employment agreements can easily insert the competitors for whom employment is prohibited, either directly—by naming them—or indirectly—by describing in detail the competitor's business (in essence, one's own). This burden seems even smaller when contrasted with the chilling effect on employment transfers precipitated by vague or limitless activity restrictions. And third, even if restrictions could be implied as to certain corporations, the employment agreement at issue lacks any way to determine in what capacities employment would be prohibited. As we describe *supra*, service as a janitor cannot be proscribed even in the employ of one's greatest competitor.

■ Finally, we question the legality of agreements written so broadly as to prohibit considerably more conduct than the pur-

---

7. As we describe *infra*, agreements which restrict the signor's ability to work for a competitor without regard to capacity have repeatedly been declared contrary to law. *See, e.g., North American Paper Co. v. Unterberger*, 172 Ill. App.3d 410, 413, 526 N.E.2d 621, 623, 122 Ill. Dec. 362, 364 (1st Dist.1988) ("Unterberger is prohibited from associating with any competitor in any capacity whatsoever, even if Unterberger's job were merely menial and he had

absolutely nothing to do with sales or purchasing.")

8. *See supra* ("Own, manage, control or participate in the ownership, management or control of, or be employed or engaged by or otherwise affiliated or associated as a consultant, independent contractor or *otherwise*").

ported legitimate interest. Various Illinois cases have of course upheld the "blue-penciling" of contracts by trial courts. *See, e.g., McRand, Inc. v. Van Beelan*, 138 Ill. App.3d at 1058, 486 N.E.2d at 1315, 93 Ill. Dec. at 480 ("[t]he court is not required to follow the terms of the covenant exactly in issuing an injunction"); *Donald McElroy, Inc. v. Delaney*, 72 Ill.App.3d 285, 295, 389 N.E.2d 1300, 1308, 27 Ill.Dec. 892, 900 (1st Dist.1979) ("Although the trial court, in its discretion, may choose to follow the terms of the restrictive covenants sued upon in granting temporary relief, it is not required to do so"). But those decisions and others like them leave the final judgment to the sound discretion of the trial court.

We exercise our discretion not to "blue-pencil" and instead to refuse issuance of the injunction. "While a trial court may employ equity principles and modify the restraints embodied in an employment agreement and enforce the restraints as modified, the fairness of the restraints imposed in the written agreement is a relevant consideration to the application of such equity principles." *See North American Paper Co. v. Unterberger*, 172 Ill. App.3d 410, 416, 526 N.E.2d 621, 625, 122 Ill.Dec. 362, 366 (1st Dist.1988). *See also House of Vision, Inc. v. Hiyane*, 37 Ill.2d 32, 39, 225 N.E.2d 21, 25 (Ill.1967). We also hope to encourage employers to write contracts more narrowly tailored to serve their own individual needs and, if necessary, to vary those documents to restrict only the activities of particular employees. We therefore refrain from "blue-penciling" the agreement at issue.

### 2. *The Non–Disclosure Clause*

■ The main question here concerns the scope with respect to time. In relevant part, the non-disclosure clause governs Hoffman's behavior "either during the term of my employment or after termination (with or without cause) of such employment." As such, the agreement's restrictions extend indefinitely.

The magistrate concluded that "[t]he provision is inherently limited in time, because confidential information inevitably becomes outdated at some point and then is no longer covered by the Agreement" [9] (pro. legal finding # 6). But merely because information becomes public at some point does not automatically render reasonable any and all restrictions for a period expiring before that date. In short, that describes the problem here: Telxon has made no attempt to align the duration of the agreement's non-disclosure portion to the valuable "life" of the information. The lack of any effort whatsoever is certainly problematic. *See AMP, Inc. v. Fleischhacker*, 823 F.2d 1199, 1202 (7th Cir.1987) (highlighting Illinois courts' suspicion of confidentiality agreements that merely restrict disclosure "during and subsequent to the period of said employment"). And while we question whether that problem, standing alone, would be so problematic as to render the entire agreement void, it furthers our doubts as to success on the merits.

■ The breadth of information covered in the non-disclosure portion of the employment agreement gives us less reason to pause than the comparable portions respecting non-competition. We recognize that certain agreements have been held "void as a matter of law" where they purport "to protect virtually every kind of information." *North American Paper Co.*, 172 Ill.App.3d at 416, 526 N.E.2d at 624, 122 Ill.Dec. at 365 ("and any and all items of whatever nature or kind which the Employee has learned of, acquired or obtained knowledge of, conceived, developed, originated, discovered, invented or otherwise became aware of during the period of his employment"). Here, however, Telxon itemizes information concerning "inventions, proposed products, sales volume, sales procedures, customers," *et cetera*, without an overbroad catchall phrase. That list is a far cry from the generic

---

**9.** We will, however, submit that merely because information becomes public at some point it does not automatically render reasonable any

and all restrictions for a period expiring before that date.

prohibitions governing Hoffman's obligation not to compete.[10]

We quickly mention that the new Illinois Trade Secrets Act, 140 Ill.Rev.Stat.Ann. ¶¶ 351 *et seq.* (Supp.1989) (the Act), does not shed much light on the issue. By its terms, the Act leaves to the sound discretion of the trial court the final decision as to whether an injunction should issue. *Id.* at ¶ 353 ("Actual or threatened misappropriation *may be* enjoined") (emphasis added). Further, neither party discusses whether the purportedly confidential information at issue here falls within the Act's definition of "trade secret"—"information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing process, financial data, or list of actual or potential customers or suppliers" ·(*id.* at ¶ 352(d))—or whether that information was misappropriated within the meaning of the statute (*id.* at ¶ 352(b)). Given that the Act leaves the final decision to us, and that our *Roland Machinery* analysis governs nonetheless, further discussion seems pointless.

## III. *The Balance of Harms*

### A. Harm Faced by Telxon

■ We first consider the legal sufficiency of Telxon's allegations: whether near-permanent relationships would be protected if the allegations are taken as true. Illinois law provides several objective indicia to determine whether the facts here suffice. *McRand, Inc., supra,* invokes several. First, the "number of years it takes the employer to develop the clientele indicates the parties' intention to remain affiliated

indefinitely." 138 Ill.App.3d at 1051, 486 N.E.2d at 1311, 93 Ill.Dec. at 476. Second, the "amount of money invested in developing a clientele is also an objective indication of the employer's intention to retain the customer relationship in a near-permanent status." *Id.* Third, we inquire into the "difficulty involved in the process of developing the clientele." *Id.* Fourth, "[i]n a highly competitive business, personal customer contact by the employee is also important in maintaining customer relationships." 138 Ill.App.3d at 1052, 486 N.E.2d at 1312, 93 Ill.Dec. at 477. Fifth, "[a] storehouse of intimate knowledge of customer requirements strongly indicates that a protectable interest in a near-permanent clientele exists." *Id.* Sixth, we review "the length of time the company has been in business, or the number of contacts a company has with a client over the relevant time period and how much time passes between each contact." *Id.* And, finally, we explore the "continuity of the relationship with the customer" or "how frequently customers need or use the services of the business, and whether that contact is often interrupted." *Id.*

Quick application to these facts makes clear that Illinois law renders legally cognizable Telxon's interest in its customer relationships. Telxon individually analyzes customer needs, taking the time to make customer-specific proposals complete with particularized software. While we cannot speculate on the amount of money expended on such proposals, the requisite difficulty in developing the clientele is present. These facts fit squarely with those of *McRand, Inc.,* where the court described

---

10. We do, however, feel compelled to distance ourselves from Telxon's interpretation of the term "know-how." Telxon claims contract terms should be given a narrow construction because it drafted the agreement. That view seriously misrepresents contract law. Documents are interpreted against the drafter's interests because the latter has the most control over word choice. By analogy, the drafter has the last clear chance, or is the cheapest cost avoider. And since most contracts contemplate contingencies from which the drafter seeks protection, a body of law has developed which requires a narrow interpretation of those safeguards. Here, however, Telxon twists the rule.

It benefits from a narrow interpretation of "know-how" because overbroad provisions endanger the entire document. Telxon's invocation of the narrow construction rule therefore attempts to save the agreement it drafted to secure various protections by restricting the signor. Quite contrary to Telxon's standard, correct application of traditional contract law to this particular fact pattern requires a broad interpretation of terms such as "know-how." Only then will the agreement be read against the interests of the drafter. But since we find the agreement's itemization of information sufficiently definite, we need not sort out the various constructions of "know-how."

the need to "identify potential customers, develop an in-depth awareness of the customer history, structure, organization, key decision makers, special needs and unique preferences." 138 Ill.App.3d at 1052, 486 N.E.2d at 1311–12, 93 Ill.Dec. at 476–77. The requisite "personal contact" is present, for individuals such as Hoffman receive assignments covering specific accounts and act as the key contact between Telxon and the customer. 138 Ill.App.3d at 1052, 486 N.E.2d at 1311–12, 93 Ill.Dec. at 476–77. The closely-related issue of Hoffman's personal knowledge of Telxon's clients appears met, but exaggerated.[11] For example, as contrasted with the *McRand, Inc.* defendants' 12 and 8 years, respectively, Hoffman had worked at Telxon for only three years at the time of his departure. And while we cannot speculate on the length of time Telxon has operated, or on the standard number of contacts with each customer, we do hold that the last factor, the continuity of the relationship, suggests near-permanency. Thus, at this stage of the litigation we hold that Telxon's interest is legally cognizable.[12]

■ Nonetheless, we conclude, as a factual matter, that the magistrate overstates the degree to which Telxon would be harmed by Hoffman's employment at Symbol. Employees in the PTC industry often change firms, and testimony indicates that those transfers can occur without the disclosure of confidential information (tr. 617–618).

We cannot doubt that with respect to certain customers Symbol will be at a short-term advantage having Hoffman by its side. He can, for example, "rig the benchmark"—suggest a test that the Telxon system would fail but the Symbol system would pass. But that scenario does not suffice. First, Telxon can always question the relevance of the proposed test. To the extent that the test actually does relate to performance, Telxon cannot use Hoffman's former employment to secure con-

tracts it otherwise would not have gotten. And where the test measures nothing relevant, but is merely created to ensure that the Telxon system fails, Telxon can surely explain its irrelevance to the potential customer. Second, this purported advantage would be of significance only in the near term. Telxon elsewhere contends that customers' needs continually change, and it therefore can re-enter the competition for accounts initially secured by others, including Symbol. So the interest allegedly furthered by the contract at issue remains quite small.

We also must denigrate the alleged advantage secured by Hoffman's presence for those "few" customers who experience problems when implementing a Telxon systems solution (pro. finding of fact # 12). When those admittedly "few" problems develop, Hoffman will be (as he is today) in Symbol's employ. As such, he will unlikely be aware of the problems faced by his former customers at Telxon and therefore could not possibly formulate a "sales strategy" directed thereto. Nonetheless, we recognize that some legitimate interest remains to be factored into the *Roland Machinery* analysis.

Although Symbol maintains it hired Hoffman without a desire for confidential information (tr. 498), and Hoffman himself contends he was never asked to disclose information and has not discussed confidential information since leaving Telxon (tr. 547–48), the magistrate sees enforcement of the agreement as necessary. "[D]efendant Hoffman cannot perform the mental lobotomy that would be necessary in order to segregate the highly confidential and sensitive information obtained while employed at Telxon and not even subconsciously use this confidential information in making any judgments while employed at Symbol/MSI" (pro. factual finding # 33).

As he took no Telxon documents with him (tr. 549–550), Hoffman's subconscious use of proprietary information remains our greatest concern. And like those problems

11. *See infra.*

12. Unfortunately for Telxon, the central meaning of our discussion here holds that a trial on

the merits would likely conclude that the Telxon employment agreement does not bind Hoffman and therefore does not protect these interests.

associated with competition, the problem here appears overestimated.

One admittedly interested party maintains that he himself was able to move between Symbol and Telxon without revealing confidential information of one's former employer[13] (tr. 461). And there is more general affirmation in the record (tr. 617–619). We additionally recognize the disincentive to disclosing a former employer's confidential information for fear of jeopardizing one's own reputation in the industry (tr. 619).

Further, the confidential information respecting new products to which Hoffman was allegedly exposed remains elusive. The Telxon employee who recounted Hoffman's knowledge testified only after he himself referred to a 38–page document replete with information, facts and figures (tr. 272–73). Hoffman saw that document but, as mentioned above, did not take possession of it (tr. 278–290). As such, we cannot expect him to recall its contents to a degree greater than that of the Telxon employee who presently works on product development. Most importantly, the products of Telxon and Symbol are incompatible (tr. 615). Hoffman's subconscious will therefore assist only in his "rigging the benchmark"—a problem we conclude above to be overstated. Nonetheless, we again recognize that some legitimate interest remains to be factored into the *Roland Machinery* analysis.

We are reluctant to put too much weight on Mr. Evans' explanation for the indemnity clause and the significant salary jump (report at n. 2). As senior vice-president of sales and marketing at Telxon, Evans' testimony is far from disinterested. This court sits in as good a position as he to speculate on why certain contract terms, including Hoffman's salary, were included. We do not hesitate to admit that the knowledge of Telxon's products may well have motivated Symbol. But the question again returns to how much of that information was legally recognizable.

Another controversy surrounds comments attributable to Paul Kemp, Symbol's senior-vice president of marketing. Mike Sitek, Telxon's area vice-president for the midwest, allegedly overheard Mr. Kemp represent that "Symbol was 'going to go after them all' (meaning Telxon's employees), and that any order this court might enter in this case would only 'slow him down'" (prop. factual finding # 40). Again, that admission is not dispositive, for the question instead concerns the degree to which those hirings would be illegal. To the extent that the Telxon employees at issue signed overly broad adhesion contracts only after having quit their prior employment, they are free to go as they wish. Further, an affidavit before this court in effect alleges that Sitek's claim took Kemp's statements out of context. Kemp claims he merely "wanted to convey to Mr. Croteau [a long term employee at Symbol] the impression that it is Symbol's policy to hire the best people for any given position and that we would not permit the threat of legal action to change that policy" (Kemp aff. ¶ 6, def.obj. exh. 7). Mr. Kemp also denies claiming that Symbol was "going after all" employees of Telxon. (*Id.* at ¶ 7.) In any event, other considerations in effect postpone to the merits our consideration of Kemp's motive and policy.

**B. Harm Faced by Hoffman**

 But for the indemnity clause in Hoffman's employment contract with Symbol, enforcement of the agreement would cause Hoffman considerable harm. He would obviously be required to leave Symbol and, further, would be prohibited from seeking employment from any of Telxon's other competitors. In effect, Hoffman would be forced to leave the entire PTC industry, the industry to which he has devoted the last three years. No doubt he would find some employment in other parts of the computer industry, as long as his new employer would not be considered a competitor of Telxon or its subsidiaries.

---

**13.** That Mr. Kurtz moved from Symbol to Telxon, and testified on the latter's behalf, makes his testimony far from disinterested.

For example, Hoffman was in data processing for about 20 years prior to his employment at Telxon. Nevertheless, his departure would be costly in both salary and prestige terms.

We therefore evaluate the impact of the indemnity clause. That provision surely covers legal fees Hoffman incurs herein. The question remains, however, whether he *would* be indemnified for the above-described reduction in salary and whether he *could* be compensated for the reduction in his employment prestige. Given the record, we cannot answer those questions. We presume that litigation expenses are covered. We surmise that Telxon may well compensate Hoffman for his reduction in salary for the first year, though we question whether that relationship will continue indefinitely. And it seems impossible to compensate him for the reduction in prestige.

Uncomfortable as we are in speculating, we think it clear that the balance of harms favors Telxon, albeit not to the degree the magistrate recommends. Only legally cognizable interests can be included on Telxon's side of the ledger, and the degree to which they have been overstated directly affects our analysis per *Roland Machinery:* the less the balance of harms favors issuance, the greater the requisite degree of success on the merits.

## IV. *The Irreparability of Harms* [14]

As a general matter, loss of business typifies precisely the species of harm where money damages provide plaintiffs with sufficient relief. Here, however, a unique question of proof arises. Monetary damages would be forthcoming only were Telxon able to demonstrate that Hoffman's intervention caused the customer to choose Symbol instead. The question to be resolved concerns whether Telxon can ascertain why a particular sale was lost.

The simple answer is "sometimes." When customers choose to purchase product from a competitor, some will describe the reasons why and others will not (tr. at 320). When a customer describes how Hoffman might have influenced their decision away from Telxon and to Symbol, *e.g.,* by "rigging the benchmark," Telxon may well have a cause of action. But there will be other instances where Hoffman's influence will remain unknown to Telxon. Only in those circumstances will the preliminary relief sought here address irreparable harm. Whether those circumstances suffice depends on the other components of *Roland Machinery*—the probability of success on the merits, the balance of harms, and the public interest.

We readily admit that "Telxon has filed numerous actions to obtain injunctive relief for violations of the Employment Agreement, and has obtained an injunction in the United Kingdom enjoining theft and disclosure of confidential information" (pro. factual finding # 36). Our inquiry centers on the propriety of awarding that relief here, and that other courts have ordered injunctions does not bind our decision.

## V. *The Public Interest*

The magistrate concludes that enforcement of the "Employment Agreement would encourage Telxon to develop more advanced products and would protect the livelihoods of Telxon's continuing employees" (pro. factual finding # 42). But the flip side of this very argument comes equally quickly to mind. As Judge Shadur noted, the benefits an employee gains from access to the collective experience of his employment, and to which he himself certainly contributes, cannot be restricted without impacting "the free market goal of

---

**14.** Again, because we do not delegate legal determinations to the parties, the following passage is basically irrelevant:

I agree and understand that the remedy at law of any breach by me of this Agreement will be inadequate and that the damages flowing from such breach are not readily susceptible to being measured in monetary terms.

Accordingly, it is acknowledged that upon adequate proof of my violation of any legally enforceable provision of this Agreement, the COMPANY shall be entitled to immediate injunctive relief and may obtain a temporary order restraining any threatened or further breach.

maximizing available resources to foster competition." *Fleming Sales Co. v. Bailey*, 611 F.Supp. 507, 514 (N.D.Ill.1985).

Accordingly, the public interest would be equally affected by both issuance and non-issuance. Our decision therefore rests on factoring into the *Roland Machinery* framework (1) the minimal likelihood of success on the merits and (2) the small degree to which Telxon's legally cognizable, irreparable interests augur for preliminary relief.

## CONCLUSION

For the foregoing reasons, we deny the requested preliminary injunction.