THIRD DIVISION

December 28, 2005

No. 1-05-2414

ARCOR, INC., 

Plaintiff-Appellee and

Cross-Appellant,

v.

DAVID HAAS, BILL SULTZBAUGH, JADTIS INDUSTRIES, LP, AND ARBOR METALS LP,  

Defendants-Appellants and

Cross-Appellees. 

)

)

)

)))))))

Appeal from the

Circuit Court of

Cook County

No. 05 CH 7960

Honorable

Philip L. Bronstein, Judge Presiding.

JUSTICE KARNEZIS delivered the opinion of the court: 

This appeal involves the determination of whether customer information can be protected as a trade secret and whether two noncompetition covenants are enforceable.  Defendants David Haas, Bill Sultzbaugh, Jadtis Industries, LP, and Arbor Metals, LP (collectively defendants), appeal from the trial court's July 1, 2005, and July 18, 2005, orders, which found that Arcor's customer information was protected as a trade secret, but that the noncompetition covenants were unenforceable because they were overbroad.  Arcor cross-appeals from both orders.  We reverse the trial court's finding that Arcor's customer information was protected as a trade secret and affirm the trial court's finding that the noncompetition covenants were unenforceable.  

Arcor is an Illinois corporation that manufactures spiral-wound center tubes made of various metals pursuant to customer specifications.  The tubes are made using "Meltog" machines and are ultimately used by customers as filtration devices. 

Haas began his employment at Arcor in 1983 and worked there until he resigned on November 29, 2004.  During his employment, Haas signed two noncompetition covenants.  In 1987, Haas signed an employment and confidentiality agreement, and in 1998, he entered into a restrictive shareholder's agreement.  

In January 2005, Haas learned that Jonell, one of Arcor's customers, had purchased two Meltog machines in order to begin producing its own center tubes, in part, due to its concerns about Arcor's ability to continue to supply center tubes.
(footnote: 1)  Haas contacted Alan Clarke, one of Jonell's owners.  Haas then contacted Bill Sultzbaugh of Arbor Metals, which had recently stopped shipping metal to Arcor because Arcor owed Arbor money.  Haas, Sultzbaugh and Clarke formed Jadtis Industries, which hired Haas as its general manager effective January 20, 2005.  Jadtis began producing center tubes after receiving the first of two new Meltog machines in mid-March 2005.  Jadtis began selling the tubes to Jonell and to 10 other companies that had also purchased from Arcor.  

In May 2005, Arcor filed suit, claiming Haas had misappropriated trade secret modifications that it had made to its Meltog machines and had breached the two noncompetition covenants.  On May 13, 2005, the court entered a temporary restraining order. 

In June 2005, the court held a hearing on Arcor's motion for a preliminary injunction.  On July 1, 2005, the court determined that the two noncompetition covenants were overbroad and unenforceable.  The court also determined, however, that a likelihood of success existed that Arcor's customer information was protected as a trade secret.  The court entered a preliminary injunction against the use and disclosure of customer information that Haas gained while employed.  Arcor subsequently filed a motion to clarify the court's order, and on July 18, 2005, the court filed an additional order.  The order specifically stated that defendants were enjoined from "[s]elling to, or soliciting sales of any spiral wound center tube produced by Jadtis from any customer of Arcor that purchased any product from Arcor prior to November 29, 2004." 

Defendants appeal from the court's finding that Arcor's customer information was protected as a trade secret.  Arcor cross-appeals from the court's finding that the two noncompetition covenants were unenforceable.    

We first consider Arcor's motion to strike defendants' statement of facts for failing to comply with Supreme Court Rule 341(e)(6) (188 Ill. 2d R. 341(e)(6)).  Specifically, Arcor maintains that defendants' statement of facts contains improper legal argument and "an extensive recitation of facts that are not relevant to any of the issues on appeal."  Defendants filed a response to the motion contending that Rule 341(e)(6) does not prohibit legal citations in the statement of facts if the citations facilitate an understanding of the case.  Defendants further maintain that their statement of facts is sufficient to allow this court to review the issues on appeal.  Although plaintiff's statement of facts is somewhat argumentative, it does comply with Rule 341(e)(6) in other respects.  We do not find defendants' statement of facts so egregious as to hinder our review of the issues on appeal. See 
Knight v. Haydary
, 223 Ill. App. 3d 564, 579-80, 585 N.E.2d 243 (1992).  We find it unnecessary to strike defendants' statement of facts.  

Trade Secret and Preliminary Injunction 

On appeal, defendants contend the trial court erred in finding that Arcor had presented sufficient evidence to establish that its customer information could be protected as a trade secret.  

A party seeking a preliminary injunction must prove: (1) a clear right or interest needing protection; (2) no adequate remedy at law; (3) irreparable harm if the injunction is not granted; and (4) a reasonable likelihood of success on the merits.  
George S. May International Co., v. International Profit Associates
, 256 Ill. App. 3d 779, 786, 628 N.E.2d 647 (1993).  The purpose of a preliminary injunction is to preserve the status quo of the parties until the trial court decides the merits of a case.  
Applebaum v. Applebaum
, 355 Ill. App. 3d 926, 932-33, 823 N.E.2d 1074 (2005).  A party seeking injunctive relief need only raise a "fair question" as to the existence of the right claimed.  
George S. May
, 256 Ill. App. 3d at 786.   

A trial court's decision to grant a preliminary injunction will not be set aside unless we find the trial court abused its discretion.  
Applebaum
, 355 Ill. App. 3d at 933.  On review, we examine whether the trial court's findings were against the manifest weight of the evidence.  
Applebaum
, 355 Ill. App. 3d at 933. 

To determine whether Arcor presented a "fair question" as to a clearly ascertainable right, specifically, that its customer information was protectable as a trade secret, we must examine the evidence pursuant to the Illinois Trade Secrets Act (the Act) (765 ILCS 1065/1 
et seq
. (West 2002)).  To set forth a cause of action for violation of the Act, a plaintiff must allege facts that the information at issue was: (1) a trade secret; (2) misappropriated; and (3) used in the defendant's business.  
Strata Marketing, Inc. v.  Murphy
, 317 Ill. App. 3d 1054, 1068, 740 N.E.2d 1166 (2000).

The Act defines a trade secret as: 

"information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that: 

(1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and 

(2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality."  765 ILCS 1065/2(d) (West 2002).    

There are an additional six common law factors that courts may also consider in determining whether a trade secret exists.  These factors are: "'"(1) the extent to which the information is known outside of [the employer's] business; (2) the extent to which it is known by employees and others involved in [the] business; (3) the extent of measures taken by [the employer] to guard the secrecy of the information; (4) the value of the information to [the employer] and to his [or her] competitors; (5) the amount of effort or money expended by [the employer] in developing the information; [and] (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." [Citation].'"  
Delta Medical Systems v. Mid-America Medical Systems, Inc.
, 331 Ill. App. 3d 777, 790-91, 772 N.E.2d 768 (2002), quoting 
ILG Industries, Inc. v. Scott
, 49 Ill. 2d 88, 93, 273 N.E.2d 393 (1971).   

In 
Liebert Corp. v. Mazur
, 357 Ill. App. 3d 265, 827 N.E. 2d 900 (2005), this court held that the plaintiffs' customer information was not a trade secret because the plaintiffs failed to take "reasonable steps" to keep the information confidential.  The court found that although electronic copies of customer information were provided to employees on a need-to-know basis, no other steps were taken to restrict any physical copies of the information.  For example, there was no evidence that plaintiffs advised their employees, verbally or in writing, that the information was confidential, and employees were not required to sign a confidentiality agreement.  
Liebert
, 357 Ill. App. 3d at 279.    

In 
Multiut Corp. v. Draiman
, 359 Ill. App. 3d 527, 536, 834 N.E.2d 43 (2005),  this court found that the plaintiff's customer information was a trade secret because the plaintiff took reasonable steps to safeguard its customer information by limiting access to both printed and computer-stored copies of the information and by requiring employees to sign confidentiality agreements.  
Multiut
, 359 Ill. App. 3d at 536.  

In 
Stampede Tool Warehouse, Inc. v. May
, 272 Ill. App. 3d 580, 651 N.E.2d 209 (1995), this court found that the plaintiff's customer information could be protected as a trade secret because of the numerous security measures plaintiff undertook to protect the information.  Plaintiff kept its offices locked, checked the garbage daily, had special computer access codes for employees, limited customer information to persons on a need-to-know basis, kept hard copies of customer lists locked, kept salesmen's call books and customer cards locked, had security cameras, and required employees to sign confidentiality agreements that stated that the names of plaintiff's customers could not be used or disclosed because they belonged to plaintiff and were confidential.  
Stampede
, 272 Ill. App. 3d at 589.  

Here, the evidence presented at the preliminary hearing concerning customer information consisted of the testimony of Tracey Smith, an Arcor employee, officer and director, who was also married to Jay Tribbey.  Smith testified that Arcor acquired two to three new customers a year because the sales process was “lengthy” as a result of the time it took to culture a relationship with potential customers.  Smith stated that Arcor's customer list allowed Arcor to maintain a competitive advantage in the marketplace and that Arcor took steps to maintain the confidentiality of the list by having its employees sign an employment and confidentiality agreement.  Smith further stated that no other efforts were made to keep track of the customer lists.  At oral argument, counsel for Arcor clarified that Arcor did not possess an actual list of its customers 
per se
, but stated that its customers were generally known to various Arcor employees such as those in the sales, marketing and billing departments.  Smith additionally stated that some Arcor customers also purchased products from its competitors.  

Here, because of the lengthy process in obtaining customers as described by Smith, Arcor may meet the first requirement that its customer information is sufficiently secret to derive economic value from not being generally known to other persons who can obtain economic value from its disclosure or use.  However, the evidence presented was insufficient to meet the second requirement, that Arcor took reasonable steps to keep the information secret.  The only security measure Arcor took was to have its employees sign an employment and confidentiality agreement.  

In determining that Arcor's customer information was a trade secret, the trial court found that Arcor had presented enough evidence to meet the threshold requirements of a preliminary injunction.  Specifically, the court found Arcor took steps by way of restrictive covenants to protect its customer information.  The court, however, did not rely on any evidence other than this limited security measure.

In 
Multiut
 and 
Stampede
, this court's determination that the plaintiffs took reasonable steps to keep its customer information confidential did not rest solely on the single step of a confidentiality agreement.  Although a confidentiality agreement is a factor to consider, it is not the only factor.  In this case, there was no evidence presented that Arcor did anything more than require its employees to sign a confidentiality agreement.  Had Arcor taken additional measures, such as limiting access to its customer information by computer password or keeping track of the hard copies of the information, we might hold otherwise, as in 
Multiut
.  Although Arcor did use confidentiality agreements, unlike in 
Liebert
, Arcor did not take the additional steps that were taken in 
Multiut
 or 
Stampede
.  Therefore, we cannot find that the limited security measure of a confidentiality agreement is sufficient to satisfy the second requirement of a trade secret.  Therefore, our inquiry ends and we find the trial court abused its discretion in granting a preliminary injunction.   

At oral argument, counsel for Arcor additionally relied on 
The Agency, Inc., v. Grove
, 2-05-0806 (November 16, 2005), to support its argument that a confidentiality agreement alone, with nothing more, is sufficient to protect its customer information as a trade secret.  We disagree.  In 
Grove
, in addition to having its employees sign confidentiality agreements, the plaintiff protected its customer list by limiting computer access through the use of passwords, allowing only managers the ability to print client files, limiting internet and e-mail availability of the information, and keeping physical copies of the information in a file cabinet in an office in which permission was necessary to access the cabinet.  
Grove
, slip op. at 17.     

Arcor's Cross-Appeal and the Noncompetition Covenants 

In this cross-appeal, Arcor contends that the trial court erred by failing to uphold the noncompetition covenants. 

On December 10, 1987, Haas signed an "Employment and Confidentiality Agreement," which contained the following noncompetition covenant: 

"5.  Restrictive Covenants.  Employer sells to customers and is in direct competition with other companies located in the United States and Canada ('Restricted Area').  

(a) During the term of this Agreement and for a period of one year thereafter EMPLOYEE, shall not, within the Restricted Area, directly or indirectly, either on his or her own account, as an employee, agent or consultant of a firm or otherwise which sells within the Restricted Area; (i) enter into or engage in the business conducted by EMPLOYER, (ii) provide services to, call upon or solicit sales from any account of EMPLOYER which has purchased items from EMPLOYER within a one year period prior to the termination of employment, even if such account was brought into EMPLOYER'S business by EMPLOYEE, or (iii) engage in, accept employment in, advise, sell the products of, represent or aid directly or indirectly any business in competition with the EMPLOYER."  

On November 16, 1998, Haas and another employee, Tracey Smith, both executed a stock purchase agreement, where they each purchased shares equal to 10% of Arcor.  Simultaneously, they entered into a "Restrictive Shareholders' Agreement."  That agreement provided:

"For a period of thirty-six (36) months after the termination of their employment neither Smith nor Haas shall be employed by, own, consult to, or be an independent contractor, for any business or venture that sells products competitive to those of Arcor at the time of the termination of such employment."  

The agreement contained no geographic limitation.  It further stated that it "supersedes all prior understandings between the parties, except to the extent such agreements are contained in the by-laws of Arcor or the minutes of its shareholders or directors."

In analyzing the noncompetition covenants, the trial court found that notwithstanding the preemptive language contained in the shareholders' agreement, both of the covenants must be considered.  The court noted that the employment covenant was for a one-year period and the geographic limitation was the United States and Canada.  The court stated, "[p]utting it bluntly, this restrictive covenant is, for all intensive [sic] purposes, an industry-wide banned [sic].  It is time limited, limited in geography to North America."  The court further stated, "[t]his agreement, in the Court's view, constitutes a blanket prohibition on competition."

The court then analyzed the shareholder agreement and also found that it was overbroad and unenforceable.  In analyzing the agreement, the court noted that employment agreements and agreements ancillary to the sale of a business were subject to different standards of reasonableness.  

Although Arcor contends in its brief that both covenants were enforceable, its argument concentrates on the shareholder agreement.  Arcor contends that the court applied the strict standard applicable to employment agreements rather than the less restrictive standard that applies to agreements ancillary to the sale of a business.  Accordingly, we focus our analysis on that contention.   

      Restrictive covenants based on employment contracts and covenants ancillary to the sale of a business are analyzed under different standards.  
Central Water Works Supply, Inc. v. Fisher
, 240 Ill. App. 3d 952, 956, 608 N.E.2d 618 (1993).  Courts impose a more stringent test of reasonableness on restrictive covenants in employment contracts than on covenants ancillary to the sale of a business because a purchaser in the sale of a business context holds more bargaining power than an ordinary employee in an employment context.  
Central Water Works
, 240 Ill. App. 3d at  956.  

If a covenant is ancillary to the sale of a business, then the covenant must only be reasonable as to time, geographical area and the scope of prohibited business activity.  If a covenant is based on an employment agreement, the one enforcing the covenant must show additional circumstances such as "a near-permanent relationship with his employee's customers and that, but for his association with the employer, the former employee would not have had contact with the customers, or the existence of customer lists, trade secrets or other confidential information."  
Central Water Works
, 240 Ill. App. 3d at  956.  

Because Arcor contends the trial court applied the employment agreement standard rather than the sale of a business standard in analyzing the shareholder covenant, we set forth the court's analysis in full.  The court stated:   

"The employment confidentiality agreement the court finds is invalid on its face.  Even though there is a different - - the Courts favor a more liberal standard of review in situations where a business is sold.  Considering the breadth of the Restrictive Stockholders' Agreement, the Court doesn't feel that this liberal standard - - even using the liberal standards where the Court feels it inappropriate that that agreement can stand either.  It has a time limitation.  It has no geographic limitation.  It is a blanket prohibition on competition and even reviewing the cases cited by the plaintiff.  In this case, the Court reads those decisions sell [sic] of a business means sell [sic] of a business.  In this case, Mr. Haas had a 10 percent share of the business, and the Court questions the viability of that reduced standard when reviewing the facts of this case."

We find 
Eichmann v. National Hospital & Health Care Services, Inc.
, 308 Ill. App. 3d 337, 719 N.E.2d 1141 (1999), illustrative.  Although this court determined that the noncompetition covenant was more analogous to an employment contract and analyzed it pursuant to that strict standard, the court's guidance on the difference between a blanket prohibition on competition and an activity restraint is helpful.  The court defined a blanket prohibition on competition as prohibiting competition within a particular geographical area.  The court defined an activity restraint as a limitation on the types of activities in which the plaintiff could engage.  Activity restraints, the court noted, can be reasonable, whereas blanket prohibitions were generally unreasonable.  
Eichmann
, 308 Ill. App. 3d at 344. 

Here, it appears that the court did apply the more liberal standard when it analyzed the shareholder covenant.  The court questioned the application of the liberal standard under the facts of the case, noting that Haas' 10% purchase of stock in Arcor was not the same as the sale of a business.  Nevertheless, the court stated that even considering the covenant pursuant to the liberal standard, it was still unenforceable because it contained no geographic limitation and was "a blanket prohibition on competition." 

We agree with the trial court that the shareholders' covenant is unenforceable because it constitutes as the trial court pointed out "a blanket prohibition on competition."  The agreement prohibited Haas from being involved in "any business or venture that sells products competitive to those of Arcor."  Although the covenant was limited in time to three years, it was unlimited in its geographical scope.  In our view, even considering the covenant pursuant to the less strict standard, it still goes far beyond trying to prevent Haas from selling center tubes to Arcor's customers.  It precludes Haas from working, in any capacity, in the industry in which Arcor does business.  This is a blanket prohibition on competition and we cannot enforce such a covenant.      

Lastly, Arcor contends that even if the covenants were overbroad, the lower court erred in failing to "blue pencil" the covenants.  Defendants contend that because Arcor never asked the court to modify the agreements, its contention is waived.  We agree.  Issues not raised before the trial court are waived on appeal.  
Nugent v. Miller
, 119 Ill. App. 3d 382, 387, 456 N.E.2d 640 (1983).

Waiver aside, even if we were to consider Arcor's contention, we find it improper to try to modify the covenants.  Although a court may modify restraints in a covenant, a court "'will neither add language or matters to a contract about which the instrument itself is silent, nor add words or terms to an agreement to change the plain meaning of the parties as expressed in the agreement.'"  
Eichmann
, 308 Ill. App. 3d at 347, quoting 
Sheehy v. Sheehy
, 299 Ill. App. 3d 996, 1001, 702 N.E.2d 200 (1998).  Although Illinois law allows a court to modify a restrictive covenant, "a court should refuse to modify an unreasonable restrictive covenant, not merely because it is unreasonable, but where the degree of unreasonableness renders it unfair." (Emphasis omitted.)  
Eichmann
, 308 Ill. App. 3d at 347-48.  

Here, in order to modify the covenants to render them reasonable, we would in effect be writing a new agreement, which is inappropriate.  We decline to do so.  

Accordingly, we reverse the trial court's finding that Arcor's customer information was protected as a trade secret.  We affirm the trial court's finding that the noncompetition covenants were unenforceable.  

Reversed in part and affirmed in part.   

THEIS and ERICKSON, JJ., concurring. 

FOOTNOTES
1: Prior to Haas' resignation, Haas and Arcor owner Jay Tribbey participated in a scheme in which they misreported Arcor's inventory and receivables to artificially inflate Arcor's borrowing base and obtain extensions of credit.  The bank ultimately became aware of the scheme and pursuant to his attorney's advice, Haas resigned his position.  As a result of the fraud, Arcor was unable to obtain adequate funding for its ongoing operations and found that its metal suppliers were unwilling to ship large quantities of metal to Arcor, which in turn resulted in long delays of center tubes to Arcor's customers.