# Illinois Official Reports

## Appellate Court

---

### *AssuredPartners, Inc. v. Schmitt*, 2015 IL App (1st) 141863

---

| | |
|---|---|
| Appellate Court Caption | ASSUREDPARTNERS, INC., ASSUREDPARTNERS, LLC, HERBERT L. JAMISON AND COMPANY, LLC, and PROACCESS, LLC, Plaintiffs-Appellants, v. WILLIAM SCHMITT, Defendant-Appellee. |
| District & No. | First District, First Division<br>Docket Nos. 1-14-1863, 1-14-2242 cons. |
| Filed | October 26, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 13-CH-19264; the Hon. Jean Prendergast Rooney, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Carmen D. Caruso Law Firm, of Chicago (Carmen D. Caruso, of counsel), for appellants.<br><br>Chapman Spingola, LLP (Robert A. Chapman and Sara Siegall, of counsel), and Merrick Law Firm (Michael J. Merrick, of counsel), both of Chicago, for appellee. |
| Panel | PRESIDING JUSTICE LIU delivered the judgment of the court, with opinion.<br>Justices Cunningham and Connors concurred in the judgment and opinion. |

**OPINION**

¶ 1    Plaintiffs brought an action to enforce the noncompetition, nonsolicitation and confidentiality provisions in an employment agreement against defendant, a former employee. The circuit court held that the restrictive covenants were unreasonable as a matter of law and entered summary judgment against plaintiffs on their claims for breach of contract and injunctive relief, but denied summary judgment on the remaining claim for tortious interference with prospective economic advantage. In a subsequent proceeding, the court denied plaintiffs leave to file three new counts in a second amended complaint, on the grounds that they were "merely rephrased and reorganized" versions of the claims previously disposed of in the summary judgment ruling. On appeal, plaintiffs contend that the court erred when it: (1) found the restrictive covenants overbroad and unreasonable as a matter of law; (2) refused to judicially modify the restrictive covenants; and (3) denied plaintiffs' request to amend the complaint with new claims for injunctive relief and breach of contract. For the following reasons, we affirm.

## I. BACKGROUND

¶ 2

¶ 3    Defendant, William Schmitt was employed by ProAccess, LLC (ProAccess), from 2006 to 2013. Following his resignation from the company, plaintiffs, AssuredPartners, Inc., AssuredPartners, LLC (collectively, AssuredPartners), Herbert L. Jamison & Co., LLC (Jamison), and ProAccess filed a lawsuit against him, seeking damages and injunctive relief. Plaintiffs alleged that Schmitt violated the noncompetition, nonsolicitation and confidentiality provisions (collectively, Restrictive Covenants) in his employment agreement, *i.e.*, "the Senior Management Agreement" (SMA), and that he "engaged in other activities designed to unfairly compete with and wrongfully divert business from AssuredPartners and ProAccess." In this consolidated interlocutory appeal, plaintiffs challenge two orders entered by the circuit court: (1) the February 14, 2014 order granting summary judgment on two of the three counts in plaintiffs' first amended complaint; and (2) the May 30, 2014 order denying plaintiffs leave to file three proposed counts in a second amended complaint.

### A. The Parties

¶ 4

¶ 5    AssuredPartners, LLC, is a Delaware corporate entity engaged in the "business of acquiring small- to medium-size retail and wholesale brokers in the property and casualty insurance and employee benefits industries." AssuredPartners, Inc., is a subsidiary of AssuredPartners, LLC.

¶ 6    ProAccess is a wholesale insurance brokerage firm headquartered in West Orange, New Jersey with offices in Chicago. Founded in 2002, it is a wholly owned subsidiary of Jamison, and engages in the business of negotiating and securing specialized professional liability insurance coverage for lawyers, accountants, healthcare professionals, and other trades. ProAccess maintains an "exclusive or semi-exclusive relationships with certain insurance carriers" that will only offer coverage products to insureds through a wholesale broker.

¶ 7    Schmitt is a wholesale insurance broker who began working in the insurance industry in the early 1990s. Since 2003, his business has centered on the lawyers' professional liability insurance (LPLI) market. As a wholesale broker, he acts as the intermediary between a retail

broker and an insurance carrier by: (1) identifying a carrier that is willing to provide the specialized coverage desired by the retail broker's client, and (2) negotiating the premium and policy wording with the carrier.

### B. Schmitt's Employment History

From 2003 to 2006, prior to his employment with ProAccess, Schmitt worked as a wholesale broker for a company known as "ProQuest." According to his affidavit, Schmitt built a "substantial" book of wholesale LPLI business during those three years, to the extent that he "plac[ed] millions of dollars in LPLI with insurers in the United States and also in the United Kingdom." In addition, during that time, he established "contacts with LPLI retail brokers and insurers, which spanned approximately a dozen of the fifty United States as well as the United Kingdom."

In 2006, Schmitt left ProQuest and began working for ProAccess in the position of senior vice-president. Schmitt was recruited to "spearhead the opening of ProAccess-Midwest" and to "promote and build ProAccess's business and relationships" throughout the United States and foreign jurisdictions where it conducted business. In the February 6, 2006 written offer of employment to Schmitt, Jim Young, a director of ProAccess, represented the following: "You will be expected to sign a non-compete agreement within your first few days of your employment. That agreement will not apply to any lawyer professional liability activity." According to Schmitt, when he first started with ProAccess, the company "had no business presence outside the northeastern United States and brokered little or no wholesale insurance with any insurer other than Interstate Insurance Group."

On February 28, 2006, Schmitt signed an employment agreement with ProAccess/Jamison (2006 agreement) that contained certain restrictive covenants. The 2006 agreement expressly provided that the confidentiality, nonsolicitation and noncompetition restrictions contained therein would not apply to "any lawyers professional liability relationship produced in the ProAccess Mid-West office." According to Schmitt, the special carve-out for his LPLI accounts was included in the 2006 agreement because of ProAccess's "recognition that [Schmitt's] LPLI customers, contacts, and expertise predated [his] work with ProAccess."

### C. The Senior Management Agreement

In December of 2011, AssuredPartners acquired Jamison and ProAccess in a deal valued in excess of $52 million. Following the acquisition, all employees of Jamison and ProAccess were required to execute new employment agreements that contained restrictive covenants. Schmitt, who was not a manager at ProAccess or Jamison, was nonetheless given the option, along with other senior managers, to purchase a small membership interest in AssuredPartners and to enter into the SMA instead of the general employment agreement.

The terms of the SMA provided that Schmitt, previously an at-will employee, would be employed for a term of four years, beginning December 13, 2015, at a guaranteed base salary of $240,000 with the opportunity to earn and receive a bonus based on performance. In exchange, Schmitt was required to agree to and comply with certain restrictions on his business activities during his employment and for a period of time after the termination of his employment. The restrictions pertinent to this appeal are set forth in the confidentiality, noncompetition and nonsolicitation provisions (sections 2(a), 3(a) and 3(b), respectively) of the SMA.

¶ 15    It is apparent from the record that the parties' accounts regarding the circumstances under which Schmitt elected to sign the SMA differ to some extent. According to Schmitt, he was told that he had to sign a new employment agreement in order to retain his job; when he asked Jim Young, also a vice-president at ProAccess, about changing some of the provisions in the SMA, Young told him it was "a take it or leave it" offer. Conversely, according to William Smith, chief counsel and executive vice president of AssuredPartners, the SMAs were "heavily negotiated" and "contained numerous benefits to the signatories that were not given to the rest of the employees." It is undisputed that Schmitt did not sign the SMA until May 17, 2012, after his attorney had reviewed the agreement. The SMA was countersigned by the representatives of Jamison and AssuredPartners, LLC.

¶ 16    Section 2 of the SMA contains a confidentiality provision, which states as follows:

"[2](a) Obligation to Maintain Confidentiality. Executive [Schmitt] acknowledges that the information, observations and data (including trade secrets) obtained by Executive during the course of Executive's employment with Employer [Jamison] concerning the business or affairs of the Company [AssuredPartners], Employer and their respective Subsidiaries and Affiliates ('Confidential Information') are the property of the Company, Employer or such Subsidiaries and Affiliates, including information concerning acquisition opportunities in or reasonably related to the Company's and Employer's business or industry of which Executive becomes aware during the Employment Period. Therefore, Executive agrees that Executive will not disclose to any unauthorized Person or use for Executive's own account (or the account of any Person other than the Company, Employer and their Subsidiaries and Affiliates) any Confidential Information without the Board's written consent, unless and to the extent that the Confidential Information, (i) becomes generally known to and available for use by the public other than as a result of Executive's acts or omissions to act or (ii) is required to be disclosed pursuant to any applicable law or court order. Executive shall deliver to Employer at a Separation, or at any other time Employer may request, all memoranda, notes, plans, records, reports, computer tapes, printouts and software and other documents and data (and copies thereof) relating to the Confidential Information, Work Product (as defined below) or the business of the Company, Employer and their respective Subsidiaries and Affiliates (including all acquisition prospects, lists and contact information) which Executive may then possess or have under Executive's control."

¶ 17    Section 3 of the SMA contains noncompetition and nonsolicitation restrictions that prohibit Schmitt from engaging in the conduct described in subsections (a) and (b), as follows:

"[3](a) Noncompetition. During the Employment Period and during the period beginning on the date of Separation and ending on the later of (x) the end of the Term and (y) the anniversary of the date of Separation (collectively, the 'Restricted Period'), Executive shall not, directly or indirectly, own, manage, control, participate in, consult with, render services for, or in any manner engage in the Restricted Business anywhere in the Restricted Area. Nothing herein shall prohibit Executive from being a passive owner of not more than 5% of the outstanding stock of any class of a corporation that is publicly traded, so long as Executive has no active participation in the business of such corporation.

(b) Nonsolicitation. During the Restricted Period, Executive shall not directly or indirectly through another entity *** (iii) induce or attempt to induce any Potential Target, customer, supplier, licensee or other business relation of the Company, Employer or any of their respective Subsidiaries to cease doing or not do business with the Company, Employer or such Subsidiary or in any way interfere with the relationship between any such Potential Target, customer, supplier, licensee or business relation and the Company, Employer or any such Subsidiary ***."

¶ 18                                    D. Schmitt's Resignation from ProAccess

¶ 19    On May 22, 2013, Schmitt's attorney served AssuredPartners with a notice of intent to pursue arbitration over a dispute regarding his compensation for 2012. In August 2013, Schmitt sent a letter to Young, advising him of his resignation effective immediately. According to plaintiffs, soon after, Schmitt began "broker[ing] wholesale LPLI under the umbrella of a retail insurance brokerage, Insurance Solutions Network, LLC." Around August 6, Schmitt emailed one of the insurance carriers that provided coverage to a ProAccess customer, stating: "I understand that there is apprehension giving [*sic*] your relationship with ProAccess *** and the timing of the renewal 9 days from now, but I can get the deal done." On or about August 8, Schmitt began sending his new contact information to the customers named in a ProAccess customer expiration list that he had serviced during his employment.[1]

¶ 20                                    E. Circuit Court Proceedings

¶ 21    Plaintiffs filed their complaint for damages and injunctive relief on August 20, 2014, and moved for a temporary restraining order (TRO). The circuit court denied the motion for a TRO, but granted plaintiffs leave to amend their complaint. Schmitt subsequently filed a four-count counterclaim seeking, *inter alia*, a declaratory judgment that the Restrictive Covenants were unenforceable as a matter of law.[2] On September 5, 2013, plaintiffs filed their verified first amended complaint, alleging claims for breach of contract (count I), tortious interference with prospective economic advantage (count II), and preliminary and permanent injunctive relief (count III). Plaintiffs submitted a list of clients that purportedly transferred their business from ProAccess to Schmitt as a result of his activities in violation of the Restrictive Covenants. Following discovery, defendant moved for summary judgment on all three counts of the first amended complaint, arguing that the Restrictive Covenants in the SMA were overbroad and unenforceable as a matter of law.

¶ 22    On February 14, 2014, the circuit court entered summary judgment as to counts I and III, and denied summary judgment as to count II. The court found the noncompetition provision unreasonable as a matter of law because Schmitt was "prevented from any business activity related to any type of professional liability insurance, and not just LPLI." Similarly, the court found the nonsolicitation provision unreasonable as a matter of law because it "would prohibit

---

[1]An "expiration list" contains pertinent customer data, including the expiration date of accounts. *Burt Dickens & Co. v. Bodi*, 144 Ill. App. 3d 875, 877 (1986).

[2]The other counts in Schmitt's counterclaim stem from the parties' dispute over his compensation for work performed in 2012 and 2013. These counterclaims, for breach of contract, violation of the Illinois Wage Payment and Collection Act (820 ILCS 115/1 *et seq.* (West 2012)), and *quantum meruit*, remain pending and are not at issue in this interlocutory appeal.

Mr. Schmitt from soliciting any business or potential acquisition of not only ProAccess or Jamison but also AssuredPartners and its more than 30 affiliate brokerages in the U.S. and U.K.," and even "attempted to restrict Schmitt from soliciting any not yet-acquired customer." Finally, the court found the confidentiality provision unreasonable as a matter of law based upon the holding in *North American Paper Co. v. Unterberger*, 172 Ill. App. 3d 410, 416 (1988). The court also declined plaintiffs' invitation to judicially modify the Restrictive Covenants so as to narrow the scope of the restraints on Schmitt's activities.

¶ 23     Less than a week after the court entered summary judgment on plaintiffs' claims for breach of contract and injunctive relief, plaintiffs requested leave to file a second amended complaint that included three new claims to enforce the nonsolicitation provision (amended counts III and IV) and to protect its "confidential information" (amended count V). On May 30, 2014, the circuit court denied plaintiffs leave to file the foregoing amendments, with prejudice, after concluding that "counts III, IV, and V of plaintiffs' proposed verified second amended complaint are counts I and III of the first amended complaint merely rephrased and reorganized." The court explained that "[b]ecause the SMA is not a candidate for judicial reformation, it cannot be enforced even in the limited manner contemplated by plaintiffs' proposed verified second amended complaint." The court then entered a Rule 304(a) finding (Ill. S. Ct. R. 304(a) (eff. Feb. 26, 2010)) as to its February 14, 2014 order granting summary judgment on counts I and III.

¶ 24                              F. Consolidated Interlocutory Appeal

¶ 25     On June 13, 2014, plaintiffs filed a notice of appeal from the February 14, 2014 order of summary judgment. On July 22, 2014, plaintiffs filed a notice of appeal from the May 30, 2014 order denying leave to file proposed amended counts III, IV, and V, after the circuit court entered a Rule 304(a) finding as to that order. We have consolidated the two appeals, over which we have jurisdiction pursuant to Rule 304(a) (*id.*).

¶ 26                                        II. ANALYSIS

¶ 27     On appeal, plaintiffs contend that the circuit court erred: (1) in granting summary judgment as to counts I and III of the second amended complaint on the grounds that the Restrictive Covenants contained in sections 2 and 3 of the SMA were overbroad and unenforceable as a matter of law; (2) by refusing to modify sections 2 and 3 of the SMA so as to comport with Illinois law; and (3) by denying their request for leave to file the proposed amended counts III, IV, and V of a second amended complaint. We begin by addressing plaintiffs' claim of error regarding the court's entry of summary judgment.

¶ 28                                     A. Summary Judgment

¶ 29     Plaintiffs contend that the circuit court erred in finding the noncompetition and nonsolicitation provisions under sections 3(a) and 3(b), respectively, unenforceable as a matter of law. They also contend that the court erred by finding the confidentiality provision unenforceable without "hold[ing] a hearing to determine whether [p]laintiffs' confidential information constituted legitimate protectable business interests." Finally, plaintiffs argue, in the alternative, that even if the Restrictive Covenants are overbroad, the court should have modified the SMA to comport with Illinois law by: (1) limiting the geographic scope of the noncompetition provision, and (2) limiting the scope of the nonsolicitation provision to only

those clients of Jamison and ProAccess with whom Schmitt had interactions during his employment with ProAccess.

¶ 30    "Summary judgment is appropriate when 'the pleadings, depositions and admissions on file, together with the affidavits, if any, show that there is no issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " *Tunca v. Painter*, 2012 IL App (1st) 110930, ¶ 13 (quoting 735 ILCS 5/2-1005(c) (West 2010)). We review *de novo* the circuit court's ruling on a motion for summary judgment. *Id.* Likewise, we review *de novo* the enforceability of a restrictive covenant based on the unique facts and circumstances in each particular case, with no single, determinative factor. *Reliable Fire Equipment Co. v. Arredondo*, 2011 IL 111871, ¶ 12.

¶ 31                              1. Enforceability of Noncompetition Provision

¶ 32    Our supreme court has established a "rule of reasonableness test" to determine the enforceability of a restrictive covenant. *Id.* ¶ 17. A restraint on trade is reasonable only if it: (1) is no greater than is required to protect a legitimate business interest of the employer; (2) does not impose undue hardship on the employee; and (3) is not injurious to the public. *Id.* Furthermore, the activity, time, and geographic restrictions must be reasonable. *Id.* "[W]hether a legitimate business interest exists is based on the totality of the facts and circumstances of the individual case." *Id.* ¶ 43. Factors considered to be relevant to this analysis "include, but are not limited to, the near-permanence of customer relationships, the employee's acquisition of confidential information through his employment, and time and place restrictions." *Id.* No single factor bears greater value in our assessment, and we must weigh each factor depending upon "the specific facts and circumstances of the individual case." *Id.*

¶ 33    Plaintiffs argue that they have a legitimate protectable business interest in their customer expiration list, which contains information such as the policy renewal dates for their LPLI customers. They contend that the noncompetition provision under section 3(a) of the SMA is enforceable because it is reasonable and no broader than necessary to protect their interest in their customer expiration list, which they claim Schmitt stole and used to solicit business away from ProAccess. In further defense of the restrictions imposed by section 3(a), plaintiffs maintain that public policy favors enforcement of a restrictive covenant where an employee behaves dishonestly in "blatantly stealing [the employer's] expiration lists of customers." Plaintiffs also suggest that Schmitt will suffer no hardship from restraints on his business activity because he will still be able to "compete for professional liability insurance in the United Kingdom" and to place "any insurance product other than professional liability insurance in the United States outside of a 50 mile radius of West Orange, New Jersey."

¶ 34    Schmitt cites *Arcor, Inc. v. Haas*, 363 Ill. App. 3d 396 (2005), as support for his argument that the noncompetition provision in this case is unreasonable. In *Arcor*, the noncompete clause prohibited the former employee, for a period of 36 months following the termination of his employment, from being " 'employed by, own, consult to, or be an independent contractor, for any business or venture that sells products competitive to those of [the employer] at the time of the termination of such employment.' " *Id.* at 403. This court found that the covenant lacked any geographical limitation and, as a result, prohibited the former employee from engaging in any business activity anywhere that involved the sale of " 'products competitive to those of Arcor [the former employer].' " *Id.* at 405-06. We declined to enforce the covenant because we found that the prohibition extended "far beyond trying to prevent [the employee]

from selling center tubes to Arcor's customers. It preclude[d] [him] from working, in any capacity, in the industry in which Arcor does business." *Id.*[3]

¶ 35    In the instant case, we find the noncompetition provision under section 3(a) equally as overbroad as the covenant at issue in *Arcor.* While we recognize that section 3(a) does contain a geographical limitation, unlike the lack of one in *Arcor*, we nonetheless still find the provision to be unreasonable. Section 3(a) prohibits him from engaging in any "portion of the Restricted Business that relates to professional liability Insurance Products or professional liability Related Services" anywhere in the United States or its territories.[4] Nowhere in the SMA, however, is there any qualifying language that limits the prohibition on Schmitt's activities to only those related to the specific kind of professional liability insurance practice he developed during his employment, *i.e.*, LPLI. Taking into consideration the undisputed evidence presented in Schmitt's affidavit: (1) that "[w]holesale brokers often possess specialized expertise in a particular line of coverage (such as *LPLI*) and have greater access to or influence with certain insurers"; (2) that he "placed millions of dollars in *LPLI* with insurers in the United States and also in the United Kingdom"; (3) that his "success [as a wholesale broker] is attributable to [his] *LPLI* expertise and the relationships with retail brokers and insurers that [he has] developed over many years"; (4) that "ProAccess did not provide [him] with any training, technology, or other specialized information unique to ProAccess to assist [him] in building [his] book of wholesale *LPLI* business"; and (5) that he "was hired specifically due to [his] contacts with *LPLI* retail brokers and insurers *** and [his] expertise in placing and serving wholesale *LPLI*," we may reasonably conclude that all, if not most, of Schmitt's business activity involved professional liability products and services related to the legal profession, as opposed to any nonlegal trades, such as healthcare or accounting. LPLI entails a specialized area of insurance that does not intersect with every other type of professional liability insurance. Yet section 3(a) prohibits Schmitt from working with *all* types of professional liability insurance, not just LPLI. Nothing in the record even suggests that Schmitt's activities during his employment with ProAccess involved any business other than LPLI. Like the covenant in *Arcor*, the Restrictive Covenant that plaintiffs seek to enforce act as a blanket prohibition intended to bar Schmitt from working as a broker, in *any* capacity, within the entire universe of professional liability insurance business anywhere in this country.[5] Such a prohibition is overbroad and unenforceable as a matter of law.

---

[3]While the facts in *Arcor* involved a noncompete agreement ancillary to the sale of a business, as opposed to the situation here involving an employment agreement, our analysis is not affected because "[c]ourts impose a more stringent test of reasonableness on restrictive covenants in employment contracts than on covenants ancillary to the sale of a business because a purchaser in the sale of a business context holds more bargaining power than an ordinary employee in an employment context." *Id.* at 404.

[4]As defined in the SMA, "Restricted Business" includes the acts of "quoting, placing, servicing, providing, soliciting and/or renewing Insurance Products or Related Services."

[5]We note that the SMA would allow Schmitt to work in any insurance-related business that does not involve any professional liability insurance products or services anywhere outside of a 50 mile radius of West Orange, New Jersey. We find any purported "reasonableness" in this restriction on Schmitt's business activities to be illusory. The evidence shows that he has not worked in any capacity other than as "a wholesale insurance focusing on LPLI" since 2003.

¶ 36    Even if we were to construe the scope of section 3(a) to include only LPLI-related activities, the noncompetition provision would still fail the test of reasonableness under *Reliable Fire*. The geographical scope of the restriction cannot be viewed as what plaintiffs have characterized as "appropriately narrow." Enforcement of section 3(a) would bar Schmitt from earning a living as a wholesale broker for all professional liability insurance products and services in every location within the 50 states and territories of the United States. "Restrictions on activities 'should be narrowly tailored to protect only against activities that threaten the employer's interest.' " *Cambridge Engineering, Inc. v. Mercury Partners 90 BI, Inc.*, 378 Ill. App. 3d 437, 452 (2007) (quoting *Lawrence & Allen, Inc. v. Cambridge Human Resource Group, Inc.*, 292 Ill. App. 3d 131, 140 (1997)). A restrictive covenant is not valid if it is broader than necessary to protect the employer's legitimate business interests. *Id*. Both the geographic scope of section 3(a) and the scope of activities it seeks to suppress clearly exceed that which is necessary to protect ProAccess and Jamison from threats against its business interest in the customer expiration list. For example, there are potentially scores of other retail brokers and vendors working with LPLI clients that are not named in the customer expiration list, possibly for a variety of reasons, *e.g.*, plaintiffs have no interest in pursuing their business or plaintiffs failed in previous bids or efforts to secure their business. Plaintiffs have *no* legitimate protectable interest in a business relationship with these retail brokers, vendors, or LPLI clients. Additionally, the provision imposes an undue hardship on Schmitt by forcing him to work in another country if he wishes to continue earning a living as a wholesale broker specializing in LPLI or any other type of professional liability insurance. Finally, we note that enforcement of the Restrictive Covenants would prevent Schmitt from working in the LPLI and professional liability insurance industry anywhere in this country for a period of 28 months, from August 2013 to December 2015. This is a significant period to impose on an employee whose effective term of employment under the SMA lasted only 20 months. Under the circumstances present here, we find that the noncompetition provision fails to meet the requirements of reasonableness under *Reliable Fire*.

¶ 37                    2. Enforceability of Nonsolicitation Provision

¶ 38    The nonsolicitation provision, under section 3(b) of the SMA, prohibits Schmitt from directly or indirectly causing any "Potential Target, customer, supplier, licensee or other business relation of" plaintiffs and their subsidiaries to cease doing business with plaintiffs and their subsidiaries or to otherwise not do business with them. "A nonsolicitation clause is only valid if 'reasonably related to the employer's interest in protecting customer relations that its employees developed while working for the employer.' " *Id*. at 455 (quoting *Lawrence & Allen*, 292 Ill. App. 3d at 138). "As a result, courts are reluctant to enforce provisions that prohibit former employees from servicing customers that they never had contact with while working for their original employer." *Id.*

¶ 39    In *Cambridge Engineering*, we declined to enforce a similarly overbroad nonsolicitation covenant. The covenant in that case provided:

> " 'd. Employee shall not, for [a period of 24 months following the termination of his/her employment], either directly or indirectly, contact or communicate with any customer, employee or representative of Employer for any purpose that is or may be detrimental to Employer, including without limitation, to engage in sales activities, employment recruitment, or solicitation of any kind.' " *Id*. at 440.

We noted that "the nonsolicitation covenant extend[ed] broadly to 'any customer, employee or representative of Employer,' regardless of whether [the employee] had contact with them as a Cambridge employee," and even encompassed past customers and companies that became customers after the employee left. *Id.* at 455. We ultimately found such a restriction "far broader than necessary to protect Cambridge's interest in preventing [its former employee] from abusing the specific client relationships he built up during his time with the company." *Id.* Accordingly, we found the nonsolicitation covenant unenforceable. *Id.*

¶ 40    Here, we reach the same conclusion as in *Cambridge Engineering*. The nonsolicitation provision in section 3(b) of the SMA precludes Schmitt from soliciting business from not only existing customers, but also potential customers of plaintiffs and their subsidiaries. We find section 3(b) broader than necessary to protect plaintiffs' interest in preventing Schmitt from exploiting the client relationships he developed and maintained during his employment at ProAccess. Instead of just protecting those customer and vendor/supplier relationships that Schmitt developed while working for plaintiffs, section 3(b) seeks to prevent Schmitt from gaining business from *any* "Potential Target, customer, supplier, licensee or other business relation"–regardless of whether the entity was involved in the LPLI trade–with whom any of the plaintiff entities *and* their subsidiaries have interacted. A "Potential Target" is defined in the SMA as "any business with which [AssuredPartners or Jamison], or any of their respective Subsidiaries [has], directly or indirectly, entertained discussions or requested and received information relating to the actual or potential acquisition of such business by [AssuredPartners] or any of their respective Subsidiaries."

¶ 41    According to the evidence presented in the circuit court proceedings, by 2013, AssuredPartners had acquired at least 47 insurance-related businesses; had done business with 30,000 customers; and had engaged in discussions with at least 50 businesses, *i.e.*, "Potential Targets," that it has not acquired. The covenant is overbroad and unreasonable under *Cambridge Engineering*, as it seeks to prohibit Schmitt from working in the future with customers, suppliers, and other business entities which he never had contact with while working for ProAccess. We therefore find the nonsolicitation provision in section 3(b) unenforceable as a matter of law.

¶ 42    Plaintiffs nonetheless urge this court to only enforce the nonsolicitation provision to the extent permissible under Illinois law. Plaintiffs outright acknowledge that the nonsolicitation provision was drafted "broadly" in an attempt to extend the scope of protection under the provision not only to AssuredPartners, Jamison, and ProAccess, but also to all subsidiaries of the foregoing entities. They concede that Schmitt "only had access to confidential information related to clients he *serviced* while with ProAccess" (emphasis added) and accordingly, they "only seek to enforce restrictive covenants with respect to those clients." This would require this court to determine how the scope of the provision should be narrowed and to enforce it accordingly. We decline to rescue a draftor from the risks of crafting a restrictive covenant that is patently overbroad. See *Northwest Podiatry Center, Ltd. v. Ochwat*, 2013 IL App (1st) 120458, ¶ 47 (refusing to read a time limitation into a restrictive covenant when no such limitation was found in the language of the covenant at issue).

¶ 43                        3. Enforceability of Confidentiality Provision

¶ 44    Plaintiffs contend that the court also erred in finding the confidentiality provision under section 2(a) of the SMA unenforceable. They argue that the confidentiality provision merely

precluded the disclosure of nonpublic, confidential information and was therefore narrowly drawn to protect their legitimate business interests. As drafted, the provision prohibits the use or disclosure of any "information, observations and data (including trade secrets) obtained by [Schmitt] during the course of [his] employment with [Jamison/ProAccess] concerning the business or affairs of [plaintiffs] and their respective Subsidiaries and Affiliates."

¶ 45    We find section 2(a) analogous to the confidentiality provision invalidated in *North American Paper Co. v. Unterberger*, 172 Ill. App. 3d 410 (1988). In that case, an employment agreement prohibited the disclosure of:

> "any and all items of whatever nature or kind which the Employee has learned of, acquired or obtained knowledge of, conceived, developed, originated, discovered, invented or otherwise become aware of during the period of his employment, provided that this paragraph shall not apply to information within the public domain and generally known within the paper and packaging industry." *Id*. at 415.

Like section 2(a), this provision "purport[ed] to protect virtually every kind of information that [the employee] learned during the period of his employment even if non-confidential, and [went] far beyond any possible legitimate protectable interest of [the employer]." *Id*. at 416. This court concluded that the provision was "an impermissible restraint of trade and [was] void as a matter of law." *Id*.

¶ 46    We reach the same conclusion with respect to section 2(a) of the SMA. As Schmitt notes, the provision "prohibits [his] use of *any information* he obtained or *any observations* he made while he worked for ProAccess." (Emphases in original.) Such information and observations concerning "the business or affairs" of every company affiliated with ProAccess would include virtually every fact, plan, proposal, data, and opinion that he became aware of during the time he was employed by ProAccess–without regard as to whether such information was in any way proprietary or confidential in nature, or whether he in fact obtained the information through a source outside of his work. It is patently overbroad. Furthermore, we cannot discount the likelihood that Schmitt introduced much of the information and knowledge regarding the LPLI business when he began working for ProAccess in 2006. He had been working in the insurance brokerage business since the early 1990s and had developed his LPLI business for the three years that he was at ProQuest. Prior to Schmitt's employment with ProAccess, the company and its parent companies had virtually no or little business interests involving wholesale LPLI products and services. Therefore, we cannot assume that the information Schmitt acquired during his employment with ProAccess resulted solely from plaintiffs' businesses, as opposed to the customer relationships that he had established prior to his employment.

¶ 47    Plaintiffs maintain that section 2(a) is more analogous to the confidentiality provision found reasonable in *Coady v. Harpo, Inc.*, 308 Ill. App. 3d 153 (1999). We disagree. The confidentiality provision in that case provided:

> " '[Y]ou are obligated to keep confidential and never disclose, use, misappropriate, or confirm or deny the veracity of, any statement or comment concerning Oprah Winfrey, Harpo *** or any of her/its Confidential Information. The phrase "Confidential Information" as used in this policy, includes but is not limited to, any and all information which is not generally known to the public, related to or concerning: (a) Ms. Winfrey and/or her business or private life; (b) the business activities, dealings or interests of Harpo and/or its officers, directors, affiliates, employees or contractors;

and/or (c) Harpo's employment practices or policies applicable to its employees and/or contractors.' " *Id*. at 157.

We found, in *Coady*, that the provision at issue ultimately "[did] not restrict commerce *** [or] plaintiff's ability to work in any chosen career field, at any time." *Id.* at 162. Rather, it was an appropriate restraint on "plaintiff's ability to disseminate confidential information that she obtained or learned while in defendant's employ." *Id.* In contrast, the confidentiality provision in section 2(a) does not merely restrict the dissemination of confidential information; it drastically limits Schmitt's ability to work in the insurance industry by preventing him from using any knowledge that he gained while in plaintiffs' employ, regardless of whether he gained such knowledge, directly or indirectly, *as a result of* his employment.

¶ 48    Contrary to plaintiffs' claim, section 2(a) is not saved merely because it is inapplicable to confidential information that "becomes generally known to and available for use by the public." There is a great deal of information that is not "generally" known to the public; not all of it merits protection under a confidentiality provision. See *Rubloff Development Group, Inc. v. SuperValu, Inc.*, 863 F. Supp. 2d 732, 749 (N.D. Ill. 2012) (citing *Reliable Fire* for the general observation that "Illinois views post-employment restrictive covenants that insist on absolute secrecy of any and all information as unreasonable and unenforceable because a person is allowed to make a living, and cannot possibly not utilize *any* information from his past job" (emphasis in original)). Accordingly, we find that section 2(a) is unenforceable.

¶ 49                              4. Judicial Modification of Restrictive Covenants

¶ 50    Plaintiffs contend that, even if sections 2 and 3 were properly found to be overbroad, the circuit court should have judicially modified them to comport with Illinois law in accordance with section 3(c) of the SMA. Plaintiffs contend that the parties to the SMA "consented to judicial modification" of the Restrictive Covenants in the event a court or an arbitrator found them "unreasonable under circumstances then existing." Section 3(c) of the SMA provides that if a restrictive covenant is found unreasonable, it is still subject to judicial modification, whereby "the parties agree that the maximum duration, scope or geographical area reasonable under such circumstances shall be substituted for the stated period, scope or area and that the court shall be allowed to revise the restrictions contained herein to cover the maximum duration, scope and area permitted by law." Schmitt maintains that modification of the covenants in question would be "tantamount to drafting a new agreement" and that the circuit court properly declined to modify them.

¶ 51    We have previously held that "[i]n some circumstances, courts may choose to modify an overbroad restrictive covenant rather than invalidate it outright." *Cambridge Engineering*, 378 Ill. App. 3d at 456. In determining whether modification is appropriate, "the fairness of the restraints contained in the contract is a key consideration." *Id.* at 457. "A restrictive covenant is unfair where its terms 'clearly extend far beyond those necessary to the protection of any legitimate interest' of the employer or, in other words, amount to 'unrealistic boundaries in time and space.' " *Eichmann v. National Hospital & Health Care Services, Inc.*, 308 Ill. App. 3d 337, 347 (1999) (quoting *House of Vision, Inc. v. Hiyane*, 37 Ill. 2d 32, 39 (1967)).

¶ 52    Here, the SMA contains several overbroad Restrictive Covenants that effectively prevent Schmitt from practicing his trade. Significantly, we are not dealing with one minor deficiency, but with several deficiencies that render sections 2 and 3 of the SMA unreasonable. We find the reasoning of the court in *Eichmann* particularly apt in the present circumstances:

"Due to the significant deficiencies of the restrictive covenants here, drastic modifications, rather than minor ones, would be necessary and that would be tantamount to fashioning a new agreement. More importantly, modification 'could have the potential effect of discouraging the narrow and precise draftsmanship which should be reflected in written agreements.' " *Id.* at 348 (quoting *Lee/O'Keefe Insurance Agency, Inc. v. Ferega*, 163 Ill. App. 3d 997, 1007 (1987)).

Ultimately, we find the deficiencies here too great to permit modification. While plaintiffs have cited several general propositions of law that apply in the context of modification, they have failed to demonstrate why judicial modification would be appropriate under these circumstances.

¶ 53    For the foregoing reasons, we find that the circuit court did not err in granting summary judgment in favor of Schmitt on counts I and III of the first amended complaint, and, further, that the court properly declined to judicially modify the unenforceable Restrictive Covenants in sections 2(a), 3(a), and 3(b) of the SMA.

¶ 54                                B. Motion for Leave to Amend

¶ 55    Plaintiffs contend that the court also abused its discretion in denying them leave to file the proposed claims under counts III, IV, and V of the second amended complaint. Incorporating their arguments regarding judicial modification, they argue that their amended pleading would "in effect, voluntarily modify the covenants signed by Schmitt by narrowing them to the greatest possible extent so as to be less restrictive." Plaintiffs argue that allowing amendment would "do justice to both parties": in effect, plaintiffs would be allowed to narrow the Restrictive Covenants and Schmitt would be prohibited "from stealing Plaintiffs' proprietary information to use for his own benefit."

¶ 56    Section 2-1005(g) of the Code of Civil Procedure (735 ILCS 5/2-1005(g) (West 2012)) provides that "[b]efore or after the entry of a summary judgment, the court shall permit pleadings to be amended upon just and reasonable terms." A court's ruling on a motion to amend the pleadings is reviewed for an abuse of discretion. *Loyola Academy v. S&S Roof Maintenance, Inc.*, 146 Ill. 2d 263, 273 (1992).

¶ 57    We consider four factors when determining whether the court abused its discretion in denying a motion for leave to amend: "(1) whether the proposed amendment would cure the defective pleading; (2) whether other parties would sustain prejudice or surprise by virtue of the proposed amendment; (3) whether the proposed amendment is timely; and (4) whether previous opportunities to amend the pleading could be identified." *Id.* "Where it is apparent even after amendment that no cause of action can be stated, leave to amend should be denied." *Regas v. Associated Radiologists, Ltd.*, 230 Ill. App. 3d 959, 968 (1992).

¶ 58    Here, plaintiffs seek leave to replead claims to enforce sections 2 and 3 of the SMA, which we have found overbroad and unenforceable. Plaintiffs, however, cannot cure the defects in these Restrictive Covenants by merely rewording, or "rephrasing" their original claims, as the circuit court pointed out. Sections 2 and 3 fail to satisfy each of the criteria for reasonableness that was established by the *Reliable Fire* court. Because the Restrictive Covenants in these sections are unreasonable as a matter of law, plaintiffs cannot sustain any claims against Schmitt that would require this court to enforce, directly or indirectly, the covenants.

¶ 59    We find no error in the circuit court's denial of plaintiffs' request to file the proposed amended claims under counts III, IV, and V of the second amended complaint with prejudice.

¶ 60                           III. CONCLUSION

¶ 61    The confidentiality, noncompetition, and solicitation provisions contained in sections 2 and 3 of the SMA signed by Schmitt are unreasonable as a matter of law and unenforceable. We affirm the orders entered by the circuit court of Cook County: (1) dated February 14, 2014, granting summary judgment to Schmitt on counts I and III of the first amended complaint and (2) dated May 30, 2014, denying plaintiffs leave to file counts III, IV, and V of the second amended complaint.

¶ 62    Affirmed.